Argued and submitted September 8, 2005, judgments of conviction and sentence of death affirmed March 30, reconsideration denied May 23, 2006

# STATE OF OREGON,
*Plaintiff on Review,*

*v.*

# MARTIN ALLEN JOHNSON,
*Defendant on Review.*

(CC C011654CR, C990528CR; SC S48826)

131 P3d 173

Eric Johansen, Senior Deputy Public Defender, Salem, argued the cause and filed the brief for defendant on review. With him on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Janet A. Klapstein, Assistant Attorney General, Salem, argued the cause and filed the brief for plaintiff on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General, Douglas F. Zier, Assistant Attorney General, and Paul L. Smith, Assistant Attorney General.

Before Carson,* Chief Justice, and Gillette, Durham, Riggs, De Muniz,** Balmer, and Kistler, Justices.

---

\* Chief Justice when case was argued.

\*\* Chief Justice when decision was rendered.

GILLETTE, J.

**GILLETTE, J.**

This case is before us on automatic and direct review of defendant's judgment of conviction and sentence of death. Defendant raises numerous assignments of error, none of which are well taken. We therefore affirm the judgments of conviction and the sentence of death.

The case began at 6:30 a.m. on February 24, 1998, when a young woman's body was discovered in the surf on a beach near Warrenton. Within a few days, the Clatsop County Sheriff's Office positively identified the body as that of Heather Fraser, a Portland-area teenager. In the meantime, a forensic pathologist examined the body and concluded that Fraser had died by strangulation.

An investigator[1] interviewed Fraser's family and friends and learned that Fraser had left her Washington County home around 2:30 a.m. on February 23, 1998, ostensibly to go to the home of her friend "Marty" to play on his computer. No one in the Fraser home knew much about "Marty," but investigators found a telephone number for a "Marty" in Fraser's bedroom. That telephone number belonged to defendant, whose first name is "Martin." Investigators also interviewed Fraser's friend, Tate, who had met "Marty." Tate told them that "Marty" was an "older guy" who always was "hitting on" Fraser and who sometimes provided Fraser with alcohol and drugs.

Investigating officers focused on defendant. They learned, among other things, that defendant was on probation for federal drug crimes, that he drove a black Acura with distinctive vanity plates, and that, at 1:54 a.m. on February 24, 1998, a police officer had stopped him as he drove south on Highway 30, a principal road between the Warrenton area and the Portland area (where defendant lived).

Investigators sought and obtained warrants to search defendant's home and car and to obtain DNA samples

---

[1] Various Clatsop and Washington county law enforcement agencies, as well as the Oregon State Police, took part in the investigation of Fraser's murder. Except when more specificity is called for, we refer to those officers as "investigators," without identifying their particular law enforcement agency.

from his person. When the police executed those warrants on February 28, 1998, they took defendant to the local sheriff's office and attempted to interview him. Defendant cut the interview short and asked to go home. The police did take him home and, after completing the search of defendant's home, left. The next afternoon, the police learned that defendant had absconded with his brother's car and credit cards and that his whereabouts were unknown. Defendant remained missing until police arrested him in Florida approximately one year later.

In the meantime, the Fraser murder investigation continued. Forensics technicians matched a bloodstain on the hatchback of defendant's black Acura to Fraser's DNA. Investigators also obtained evidence that defendant habitually preyed on underage girls, taking them to nightclubs, providing them with alcohol and drugs, engaging them in consensual sexual relations when possible and, most significantly, sexually abusing them while they were rendered unconscious by drugs that he had provided to them. Finally, they learned that Fraser had a significant amount of morphine in her system when she died and that her vaginal cavity contained semen whose DNA matched defendant's DNA.

On the basis of the foregoing evidence, a Washington County grand jury issued an indictment on March 11, 1999, charging defendant with six counts of aggravated murder. On June 15, 2001, a grand jury issued a new indictment charging defendant with 11 counts of aggravated murder. The case came to trial. At the close of the evidence, the trial court granted defendant's motion for a judgment of acquittal with respect to three of the charges. The jury convicted defendant of the remaining eight aggravated murder counts and voted to impose the death penalty. After the trial court entered judgment, defendant filed the present direct appeal, raising 35 assignments of error in an initial brief and 13 assignments of error in a supplemental *pro se* brief. As we shall explain, we have considered each of those claims of error and reject them all.

For convenience, we have divided defendant's assignments of error by topic and have confined our analytical statements to those assignments of error under each topic that merit discussion.

# I. SEARCH AND SEIZURE ISSUES

## A. *Background*

Defendant's first ten assignments of error pertain to the trial court's denial of various motions to suppress evidence that the police obtained pursuant to a series of search warrants. Eight of those assignments pertain to motions that the trial court refused to hear on timeliness grounds. Defendant offers no argument to this court that the trial court erred in refusing to hear the motions and, on this record, that decision appears to have been well within the trial court's discretion. We conclude that the trial court's denials of the eight motions to suppress are not properly before this court.

We turn to the two suppression motions that were timely filed and whose merits the trial court did consider. The factual background relevant to those motions is as follows. On February 28, 1998, an investigator executed an affidavit requesting warrants to search a specified black Acura automobile and a specified Washington County address for evidence of various crimes, including murder. In the affidavit, the officer described the discovery of Fraser's body; the conclusion of a forensic pathologist that she had been strangled; reports from Fraser's mother and other members of the Fraser household of Fraser's intent to go to "Marty's" to "play on his computer"; a report that "Marty" had called the Fraser home shortly before Fraser left on the morning of February 23, 1998; a report by Fraser's friend, Tate, that "Marty" was an "older guy" who was always "hitting on" Fraser and who may have raped or sexually abused Fraser when Fraser was knocked out on drugs that "Marty" had provided; the discovery of a cellular telephone number for "Marty" in Fraser's bedroom; the fact that the telephone number had been traced to defendant; the fact that at least 40 telephone calls had been placed to Fraser's home from defendant's telephone in the previous three months; the fact that defendant was on probation for federal drug offenses; the fact that defendant had been stopped in his black Acura on Highway 30 a few hours before Fraser's body was discovered near Warrenton; and the fact that Highway 30 runs between the Warrenton area on the coast and the Portland area where defendant lived. The affidavit ended with a request for warrants to

search a specified address and a black Acura with the "TIGERL" license plates. Notably, the affidavit contained no factual assertions connecting defendant or the Fraser murder to the specified address.

A judge issued the requested warrants, authorizing the police to search the residence and car for evidence, including but not limited to: "samples of earth, soil and sand, hair or other trace evidence," clothing and personal items belonging to Fraser and "any letters o[r] writing from or belonging to Heather Fraser, including any computer passwords or other identification purporting to belong to Heather Fraser."

Investigators immediately went to the specified address to execute the warrants. They found the black Acura parked in the driveway and had it towed to the Washington County sheriff's office, where they later subjected it to an intensive search that produced a single piece of evidence—a small bloodstain on the car's hatchback that matched Fraser's DNA. In the course of the search of the home, investigators discovered and seized a number of items, including three computers.

On March 4, 1998, an investigator executed an affidavit requesting warrants to search the electronic files contained in the three computers seized from defendant's home. The warrants issued on March 5, 1998, and the ensuing search turned up one important item of evidence: An electronic record showing that, at 5:00 a.m. on February 24, 1998, someone had used one of the computers to access a tide table for the Astoria/Warrenton area.

Finally, on March 12, 1998, an investigator executed an affidavit requesting a second warrant to search defendant's Washington County residence. That affidavit repeated much of what had appeared in the first affidavit described above, but also contained additional information: a brief description of the February 28, 1998, search of defendant's Washington County residence, including the fact that, in the course of that search, detectives had observed albums containing photographs of young girls, sometimes nude; information that, within a few hours of the February 28, 1998, search, defendant's brother had reported to police that defendant had absconded with the brother's car and credit cards; a

report that one of defendant's coworkers had provided police with a copy of a personal "address book" of teen and preteen girls, which the coworker previously had printed from defendant's work computer; and reports of interviews with a number of young women and girls who claimed that defendant had administered drugs to them that made them sick or rendered them unconscious, and that, in some of those cases, defendant sexually abused the women while they were incapacitated. A warrant issued pursuant to that affidavit and police officers executed the warrant on March 13, 1998.

Defendant's first motion to suppress focused on the seizure of the three computers during the February 28, 1998, search. He argued that seizure of the computers was unlawful, because computers were not listed as items to be seized in either the search warrant itself or in the underlying affidavit. Defendant further argued that evidence obtained under the March 5, 1998, warrant to search the computers' electronic files (the tide table record) and during the second (March 13, 1998) search of defendant's residence were unlawfully seized in that the warrants that authorized those searches depended, in one sense or another, on the initial unlawful seizure of the computers on February 28, 1998.

The trial court agreed with defendant that the computers were outside the scope of the February 28, 1998, warrant, but concluded that their seizure was proper under a "plain view" theory, *i.e.*, the police were authorized to be in the residence, the computers were in plain view, and their evidentiary value was immediately apparent. That conclusion undermined defendant's main theoretical premise and resulted in denial of his motion.

Defendant later filed an amended motion to suppress, seeking suppression of *all* items seized pursuant to the February 28, 1998, search warrant. In that motion, defendant argued that the affidavit in support of the search warrant did not support a finding of probable cause to search either the residence or the car. The trial court rejected defendant's arguments with respect to the car but ultimately agreed with defendant that the affidavit did not establish probable cause to search the residence, apparently because the trial court believed that the affidavit contained no factual

assertions connecting defendant to the residence to be searched. However, the trial court concluded that the evidence obtained from the residence (the computers and, ultimately, the tide table evidence) nonetheless was admissible under the "inevitable discovery" doctrine. Accordingly, the trial court denied defendant's amended motion to suppress.

Defendant argues that the trial court erred in denying each of the described suppression motions. However, because—as we have stated—the trial court abandoned its reasoning for denying defendant's first motion to suppress, the real fight is about the second motion.[2] As we have described, that motion was directed at the February 28, 1998, warrants that purported to authorize the search of defendant's residence and car.

## B. *Search of Defendant's Residence*

■■ As noted, the trial court held that the February 28, 1998, warrant to search defendant's Washington County residence was defective, and we proceed with our analysis on the premise that that ruling was correct. Consequently, any evidence obtained from the search made pursuant to that warrant would be subject to suppression, unless the state can "purge the taint" of that unlawfulness. *See generally State v. Johnson*, 335 Or 511, 73 P3d 282 (2003) (explaining methods and burden of proof to purge taint of unlawful search or seizure).

■ This court has stated that the taint may be purged, thus rendering that evidence admissible, by proving that "such evidence inevitably would have been discovered, absent the illegality, by proper and predictable police investigatory procedures." *State v. Miller*, 300 Or 203, 225, 709 P2d 225 (1985). To prevail on an inevitable discovery argument, the state must show, "by a preponderance of the evidence: (1) that certain proper and predictable investigatory procedures would have been utilized in the instant case, and

_____

[2] Our choice to deal with this issue on the basis of the doctrine of "inevitable discovery" should not be understood as an expression of approval by this court of the trial court's conclusion that the first warrant was invalid. We express no opinion on that issue.

(2) that those procedures inevitably would have resulted in the discovery of the evidence in question." *Id.* at 226. In the present case, the trial court concluded that, in spite of the defects respecting the February 28, 1998, search of defendant's home, the evidence obtained from that search (*i.e.*, the tide table evidence) was admissible because the state had "purged the taint" of that unlawful search by showing that the tide table evidence inevitably would have been discovered. Specifically, the trial court found that,

> "[h]ad the * * * computers not been seized, or had the original request for the search warrant been denied, the investigating officers would have subsequently sought a separate search warrant for the house, including a request to seize computers. The execution of a search warrant for the house is a proper and predictable investigation procedure that would have been utilized. * * * The tide chart information from the computer of the defendant would not have been deleted before the seizure of that computer."

Defendant argues that the trial court's "inevitable discovery" findings are not supported by the evidence. He focuses, first, on the finding that, through "proper and predictable" procedures, investigating officers would have obtained a lawful warrant to search the house, which warrant would have listed computers among the evidence to be seized. Defendant contends that any subsequent search of that sort necessarily would have been tainted, because it would have been based on observations made by the investigating officers during the illegal search of February 28, 1998.[3]

We disagree. Although it is true that investigators *did* refer to observations made during the unlawful February 28, 1998, search when, on March 12, 1998, they swore out an affidavit seeking a second warrant to search the home, those observations were not necessary to establish probable cause to search the residence or to seize computers from the residence. There can be no real doubt that, as the evidence

---

[3] Defendant does not appear to be arguing that the investigators never would have submitted an affidavit that contained facts showing a connection between defendant and the residence to be searched.

showed and the trial court found, even if the police had not performed the February 28, 1998, search at all, they could have,[4] and ultimately would have,[5] produced an affidavit that established probable cause to search defendant's residence for evidence in Fraser's murder.[6] Neither is there any doubt that the police quickly would have recognized the evidentiary potential of any computers located in defendant's home or that, if their warrant did not already authorize the seizure of computers, they would have obtained additional warrants that did. We find no error.[7]

---

[4] In that regard, we note that the February 28, 1998, affidavit contained everything that was needed to establish probable cause to search defendant's home except—arguably—for information establishing that the address in question was, in fact, defendant's home (and Fraser's likely destination on the morning of February 23, 1998). It appears, moreover, that, by February 28, 1998, the police had information establishing that fact.

[5] A police investigator testified at the first of two omnibus hearings held with respect to defendant's motion to suppress that, had the initial request for a warrant to search the home been denied, he would have sought and obtained another warrant.

[6] We acknowledge that application of the inevitable discovery doctrine in the present case is different from its typical application, as exemplified in *State v. Miller*, 300 Or 203, 709 P2d 225 (1985). There, the defendant sought to suppress evidence obtained when a dead body was discovered in his hotel room, on the ground that the police had entered the hotel room illegally. The court concluded that the evidence was admissible in spite of the illegal search because the body inevitably would have been discovered by an entirely independent third party— specifically, the hotel maid—who would have called in the police. Here, in contrast, the state seeks to excuse the failure of police investigators to obtain a proper warrant on the ground that the *same* investigators could have and eventually would have obtained a proper warrant.

Obviously, in cases like the one at hand, some question arises respecting how independent a subsequent lawful warrant application and search would be when the people who "inevitably" would pursue those ends are the same ones who were involved in the initial illegality. Some jurists have suggested, in fact, that using the inevitable discovery doctrine in such cases cannot be justified, because it creates an incentive to police to engage in warrantless searches and could effectively swallow the warrant requirement. *See, e.g., Murray v. United States*, 487 US 533, 544-52, 108 S Ct 2529, 101 L Ed 2d 472 (1988) (Marshall, J., dissenting) (so stating). However, the United States Supreme Court has concluded, and we agree, that the inevitable discovery doctrine is available in such circumstances, at least to the extent that the state affirmatively shows not only that there was an independent basis for obtaining a lawful warrant but that investigators would have sought a lawful warrant regardless of the unlawful search. *Murray*, 487 US at 543-44. In the present case, the trial court was careful to make findings on both of those points and its findings are supported by the evidence.

[7] Defendant separately takes issue with the trial court's finding that, when the police obtained a proper warrant, the tide table information still would have been on one of the computers. That argument does not merit extended discussion. In our view, the record fully supports the trial court's finding.

## C. *Search of Defendant's Car*

Defendant next contends that the February 28, 1998, search of his black Acura was unlawful. He advances several arguments, only one of which merits discussion. Defendant argues, in fact, that the search warrant affidavit improperly relies on hearsay statements by certain unnamed informants, (identified only as persons living in the Fraser household) without establishing the informants' reliability or basis of knowledge, as ORS 133.545(4) requires.[8] The short answer to defendant's concern is that the statements at issue were not vital for establishing probable cause.

Defendant also questions the reliability of certain other statements reported in the affidavit—specifically, those of Fraser's friend, Tate. Tate's statements were necessary to establish probable cause to believe that defendant was involved in Fraser's death: She reported that defendant was an "older guy" who always was "hitting on" Fraser, that "Marty" gave Fraser fake ID and alcohol and took her to nightclubs, and that Fraser believed that "Marty" had raped her after giving her some pills that knocked her out. Defendant contends that, because many of Tate's statements were double hearsay (she reported statements made to her by Fraser), her statements should not be considered reliable.

Again, we disagree. The reliability of Tate's statements can be inferred from the fact that Tate was a citizen informant who was willing to have her name used and who had no apparent motive to falsely accuse defendant. Moreover, her statements were based either on her own personal observation and knowledge or statements made to her by Fraser about matters that would have been within Fraser's personal observation and knowledge. There is no statutory or constitutional requirement that the affidavit contain any more particular proof of the reliability of Tate's statements. *See, e.g., State v. Farrar*, 309 Or 132, 144-45, 786 P2d 161 (1990) (indicating that constitutional standards for determining sufficiency of warrant based on information supplied

---

[8] ORS 133.545(4) provides, *inter alia*, that "[i]f an affidavit is based in whole or in part on hearsay, the affiant shall set forth facts bearing on any unnamed informant's reliability and shall disclose, as far as possible the means by which the information was obtained."

by unnamed informant set out in *Aguilar v. Texas*, 378 US 108, 84 S Ct 1509, 12 L Ed 2d 723 (1964), *overruled by Illinois v. Gates*, 462 US 213, 103 S Ct 2317, 76 L Ed 2d 527 (1983), and *Spinelli v. United States*, 393 US 410, 89 S Ct 584, 21 L Ed 2d 637 (1969), *overruled by Illinois v. Gates*, 462 US 213, 103 S Ct 2317, 76 L Ed 2d 527 (1983), and codified at ORS 133.545(4) are inapplicable when information contained in an affidavit is provided by a named informant and that, in such cases, court construes affidavit in "common sense and realistic fashion" to determine if there is probable cause).

## II. MOTIONS TO EXCLUDE DEFENDANT'S STATEMENTS

Defendant sought to exclude various statements that he made to the police on the ground that the statements either (1) were made under custodial compelling circumstances without warnings like those required by *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 694 (1966), or (2) were the product of interrogation after defendant had asserted his right to counsel. The trial court found that, with certain specified exceptions, defendant's various statements were admissible. Defendant challenges that ruling in three separate assignments of error. Defendant loosely identifies three groups of statements that he asserts should have been suppressed.

### A. *Statements on February 28, 1998*

The first group of statements were made to Washington County Investigator Bowman and his associates over a nine-hour period on February 28, 1998. Bowman and the others came to defendant's home at 8:30 p.m. to execute warrants to search defendant's home and car and to obtain DNA samples from his person. Defendant did not answer the door when the police knocked and rang, but he did finally respond when the investigators called to him by means of a police car "hailer." When defendant came out of his house, several officers had drawn their guns. Defendant was told to get down on his knees and to keep his hands up. Defendant was searched and then was advised that the police were there to execute search warrants, including a warrant to obtain DNA evidence from his person. At that point, weapons holstered, investigators asked defendant if he would come to

the sheriff's office for that purpose and otherwise to assist in the investigation. Defendant agreed to do so. He was driven to the sheriff's office by a police detective and was told by another detective that he was not under arrest.

At the sheriff's office, defendant agreed to be interviewed and to allow the interview to be recorded. A few minutes into the interview, however, defendant said that he wished to terminate the interview. The investigators stopped the interview and the taping and proceeded to take samples of defendant's hair and saliva. Midway through that process, the investigators discovered that their warrant was defective. They asked defendant to provide the samples voluntarily, but he replied that he would not provide them without first talking to a lawyer. The investigators then left defendant alone in the interview room while they attempted to amend the defective warrant. After a period of time they returned, reactivated the tape recorder, and accused defendant of erasing part of the tape. Defendant told the investigators that he wanted to go home and did not want to talk to them. The investigators left the room again and then returned and activated the tape in order to confront defendant about looking through notes that an investigator had left in the room. Finally, after assuring defendant again that he was not under arrest, the investigators searched and photocopied the contents of defendant's wallet, took photographs of him, and drove him back to his home, where the house search still was going on.

Defendant spent the next several hours outside of the house with an investigator, McKinney, waiting for the house search to end. During that time, defendant asked McKinney about Fraser's death, but McKinney told him that he could not talk to defendant about it. Defendant then commented that he "wished [McKinney] was either a lawyer or a priest."

Before the trial court, defendant argued that all the statements that he made to the investigators in the course of the foregoing events were inadmissible, primarily because he was in custody or, at least, in "compelling circumstances" and had not been read the usual *Miranda* warnings. The trial court, however, expressly found that defendant was *not* in

custody on February 28, 1998, that the circumstances were not compelling, that defendant's statements to police detectives on that date were freely and voluntarily made, and that his statements to McKinney were spontaneous and not the result of questioning. Significantly, the court also found that defendant was "sophisticated in the ways of the criminal justice system" and that "when he didn't want to talk, he didn't talk."

■ Defendant challenges the foregoing findings, albeit in very general terms. However, we have reviewed the record and are satisfied that the trial court's rulings were correct. It is true that defendant reasonably could have—indeed, may have—believed that he was in custody when police officers summoned him from his home with a bullhorn and met him outside with drawn guns. However, we think that any such belief (assuming that defendant even had it) would have been dispelled when the investigators then presented defendant with apparently lawful search warrants, asked him to come down to the station to assist in an investigation, and told him explicitly that he was not under arrest. Other aspects of the interlude also support the conclusion that the circumstances were neither custodial nor "compelling." Most telling are the facts that defendant very actively controlled the interrogation once he was at the station and that, when he asked the investigators to terminate the interview and to return him to his home, they did so. The evidence also verifies the trial court's conclusion that defendant's statements to McKinney while waiting outside his home for the police to finish their search were spontaneous on his part and not the product of any interrogation. In sum, defendant's assignment of error respecting his February 28, 1998, statements is not well taken.

B. *Defendant's Statements to Bowman on February 24, 1999*

■ Defendant also challenges the admissibility of statements that he made to Bowman on February 24, 1999. Defendant was arrested in Florida on February 20, 1999, on a parole violation warrant. Bowman flew to Florida a few days after that arrest in order to collect body fluid samples from defendant's person. When he met with defendant, Bowman

did not question him about the murder but, instead, merely explained to him that a detainer would be filed in connection with Fraser's death and that, although the detainer stated that defendant was charged with murder, it was possible that the charge would be upgraded to aggravated murder. As Bowman executed the warrant, defendant told him that he (Bowman) had made a mistake in February 1998, by letting defendant go, and he asked Bowman if he had gotten in trouble for doing so. Bowman told defendant that he could not speak to defendant about those matters. Bowman acknowledged that he had not given defendant *Miranda* warnings during that meeting.

The trial court clearly found Bowman's testimony to be credible and, according to that testimony, defendant's statements were made freely, voluntarily, and spontaneously, and were not the result of questioning by Bowman. Defendant suggests, however, that, even if Bowman did not overtly question defendant, his actions were the "functional equivalent" of interrogation.

■ It is true that "interrogation" need not always involve overt questioning, but may instead be accomplished by other words or actions by police that the police should know are reasonably likely to elicit an incriminating response. *See, e.g., Rhode Island v. Innis*, 446 US 291, 300-01, 100 S Ct 1682, 64 L Ed 2d 297 (1980) (for purposes of determining whether police violated a criminal defendant's right to counsel or right to remain silent under Fifth and Sixth Amendments, "interrogation" includes words or actions that police know are reasonably likely to elicit an incriminating response). However, defendant does not explain how that principle applies to his February 24, 1999, interaction with Bowman, and we cannot divine from the record anything that Bowman did or said that could be deemed a functional equivalent of interrogation. We therefore reject defendant's contention that admission of the statements violated his constitutional rights to counsel and to remain silent.[9]

---

[9] Defendant makes one other argument in this respect that we do not consider to require discussion.

## C. *Defendant's statements to Bowman and McKinney on March 4, 1999*

■ Finally, defendant challenges the admissibility of statements that he made to police officers on March 4, 1999. On that date, Bowman and McKinney accompanied defendant on a flight back to Oregon from Florida. Shortly after the three men boarded the plane, McKinney advised defendant of his *Miranda* rights. McKinney then told defendant a story that obviously was geared toward inducing defendant to waive those rights. However, defendant did not respond to the inducement. Defendant told the investigators that he planned to make a statement about the case "through an attorney" but that he was willing to talk to them about what he had done after leaving Oregon the year before. When pressed, defendant stated unequivocally that he wanted an attorney before he made any statements. Thereafter, McKinney and Bowman did not attempt to talk to defendant about Fraser's murder and the conversation turned to other topics. In the course of the ensuing conversation, defendant made certain comments that the state sought to introduce at trial, specifically: (1) defendant told Bowman and McKinney that he wanted to be out of prison before he reached Social Security age and that he had worried about his retirement while he was on the run; and (2) defendant asked McKinney if he (defendant) would be charged with a sex crime as well as murder, stating that he was concerned because he knew that people who committed sex crimes often had a more difficult time in prison. The trial court concluded that the statements were admissible.

Defendant argues that McKinney's and Bowman's actions were the functional equivalent of interrogation and, more particularly, of continued interrogation after his invocation of the right to counsel. But, again, defendant does not point to any particular actions or words by Bowman or McKinney as being aimed at eliciting an incriminating response. And, as we previously noted, the trial court earlier had found that defendant was "sophisticated in the ways of the criminal justice system" and, "when he didn't want to talk, he didn't talk." In sum, we perceive nothing in the record to support defendant's arguments. The trial court did not err.

## III.   MOTION TO SUPPRESS SUBPOENAED RECORDS

■        Defendant's next assignment of error pertains to his motion to suppress certain evidence that investigators had subpoenaed from third parties. The subpoenaed items included bank records, medical records, cellular telephone and pager records, employment records, and the like. Defendant argues that, although the records all were created and maintained by third parties, he had a significant "privacy interest" in them, in that they pertained to his activities and transactions in areas that the legislature has recognized as private. Because of his privacy interest in the records, defendant argues, the state could not lawfully obtain them by means of a mere subpoena directed at the entities that created and maintained the records but, instead, must obtain a search warrant. Defendant concludes that, because police investigators did not obtain search warrants for the records and there were no exigent circumstance obviating the need for warrants, the records must be suppressed.

Part of our difficulty with this assignment of error is the fact that defendant adverts generally to the denial of his motion to suppress, but does not specify which of the myriad items described in the motion were erroneously admitted during his trial. Our only hint in that respect comes from the state's brief: It describes five items that were admitted at trial that potentially are relevant to defendant's motion: (1) photographs from a bank surveillance camera showing defendant withdrawing money from an automatic teller machine (ATM) at 8:54 p.m. on February 24, 1998; (2) evidence that defendant drove a black Acura with "TIGERL" vanity plates; (3) records provided by defendant's employer of telephone calls made from defendant's work station in February 1998; (4) testimony by a personnel specialist from defendant's workplace that defendant's employment records listed defendant's home as being at a specified address in Washington County; and (5) records of telephone calls made in 1997 and 1998 on defendant's account with a cellular telephone provider. We dismiss the first four items without discussion: We reject any claim that defendant might have a cognizable privacy interest in the license plates on his car, photographs taken of him in a public place, the address that

he provided to his employer for tax and payroll purposes, or the telephone usage records of his employer.

■      In considering whether the prosecutor needed a warrant to obtain defendant's own cellular telephone records, we begin with this court's observation in *State v. Tanner*, 304 Or 312, 319-20, 745 P2d 757 (1987), that, under the Oregon Constitution, a person's right to be free from unreasonable searches extends to those places and things in which the person has a "privacy interest," even when there is no physical or sensory invasion into the person's own possessions or space. Whether a person has a cognizable privacy interest in an item is an issue of law.

Defendant clearly had a cognizable privacy interest in the *content* of his telephone calls. *See* ORS 133.724 (setting out requirement that police obtain judicially issued warrant to intercept a telephonic communication). However, we cannot identify a source of law that establishes that defendant also had some interest in keeping private any records kept by a third party, his cellular telephone provider, respecting his cellular telephone usage. The cellular telephone provider generated and maintained those records from the provider's own equipment and for the provider's own, separate, and legitimate business purposes (such as billing). *Cf. State v. Meredith*, 337 Or 299, 96 P3d 342 (2004) (defendant, whose location and on-the-job activities were monitored via transmitter attached to her employer's vehicle, had no protected privacy interest in being free from that type of observation by her employer). Neither are we aware of any principle that would prevent the cellular telephone provider from responding to a proper subpoena. Defendant's assignment of error is not well taken.

## IV.  ADMISSIBILITY OF PRIOR BAD ACTS TESTIMONY

Defendant next assigns error to the trial court's decision to admit certain testimony that defendant challenged as "prior bad act" or "propensity" evidence. Before trial, defendant filed a motion *in limine* regarding the admissibility of the testimony of 98 persons whom the state had identified as potential witnesses. The motion was directed primarily at limiting or excluding testimony about defendant's prior

crimes or bad acts. Before the trial court decided the motion, the state indicated that it intended to use only 32 of the 98 witnesses identified in the motion. Thereafter, the trial court issued an order denying the motion, with certain exceptions. Defendant assigns error to that order, arguing that all the testimony should have been excluded.[10]

Defendant's challenges pertain to testimony in both the guilt phase and the penalty phase of his trial. The challenged guilt-phase testimony falls roughly into four categories: (1) testimony by various young women that defendant gave them alcohol, morphine, or other drugs that caused them to black out or become ill, some of whom further stated that defendant had sexually abused them while they were incapacitated by the drugs defendant had administered; (2) testimony of witness Franklin that a female friend had told him that defendant had drugged and raped her; (3) testimony of witness Robinson about two interactions with defendant; and (4) testimony of a witness that he was defendant's probation officer and that defendant was living at his mother's Washington County residence in February 1998.[11]

Although defendant describes the foregoing categories of witnesses in his arguments to this court, he does not make separate arguments regarding the purposes served by the testimony of each category of witnesses. Instead, he argues, generally, that *all* the testimony from those witness had only one conceivable purpose—to prove his bad character

---

[10] Although defendant's motion focused on "prior bad acts" issues, it also sought to exclude certain witnesses on hearsay grounds. We deal with those arguments separately, *post*.

[11] Defendant also challenged three categories of witnesses who testified only in the trial's penalty phase: (1) testimony by witness Freeman that he had known defendant in the 1970s and had observed him experimenting with "date rape" drugs, including putting a substance on a cloth and putting it over a young woman's face until she blacked out; (2) testimony of various young women that, when they were under the age of 18, defendant obtained their telephone numbers and addresses from a phony petition and began calling them and discussing sexual matters or sending them items of a sexual nature through the mail; and (3) testimony of two young women that they had lived with defendant, had obtained drugs and alcohol from him, and had had consensual sexual relations with him, when they were under the age of 18. Those challenges do not require an extended discussion. We note only that a defendant's future dangerousness is directly at issue during the penalty phase of a capital trial and that other bad acts generally are relevant to that issue.

and that he had acted in accordance with that character. We consider, first, how that argument pertains to the witnesses who testified in the guilt phase of defendant's trial.

■    As a general proposition, evidence of a defendant's other crimes, wrongs, or bad acts is not admissible in a criminal case to prove the defendant's antisocial or criminal propensities. OEC 404(3). However, such evidence may be admissible to prove *other* facts that are relevant in the case, as long as the chain of logical relevance connecting the evidence to the "other" fact or facts does not ultimately rely on an inference relating to the defendant's character or propensities. *Id. See also State v. Pinnell*, 311 Or 98, 105 n 11, 806 P2d 110 (1991) (OEC 404(3) "provides an avenue for admitting evidence that proves guilt without any inference to character").

■    Notably, this court has observed that the rule stated in OEC 404(3) employs an "inclusionary" approach to the prior bad act problem. *See State v. Johns*, 301 Or 535, 548, 725 P2d 312 (1986) (so stating). That means that, while the rule sets out a list of possible "exceptions" to the general prohibition on prior bad act evidence ("motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident"), the rule does not purport to cover every imaginable purpose to which prior bad act evidence might logically and lawfully be applied. *Id.* at 549. Thus, the essential inquiry under OEC 404(3) is not whether the testimony can be made to fit into one of the listed categories, but whether and how it is logically relevant to a noncharacter issue in the case. *Id.*

■    We begin with the first category of witnesses described above, *viz.*, young women who claimed that defendant had drugged them to the point of incapacitation with morphine or other substances. Some of those witnesses also claimed that defendant had taken advantage of them sexually while they were under the influence of the drugs that defendant had administered or supplied. The state argued that the testimony of those witnesses was relevant to prove several elements of its case against defendant—most notably, that defendant had raped Fraser before he murdered

her. In that regard, we note that the state had strong direct evidence that defendant had had sexual intercourse with Fraser shortly before she died but had no way of proving directly that that defendant's sexual contact with Fraser was nonconsensual.[12] However, when combined with the toxicology report showing a significant level of opiates in Fraser's system, the testimony at issue would be powerful circumstantial evidence that defendant's sexual contact with Fraser occurred after he had drugged her, and that he took advantage of her incapacitated state. The inferences that the state wished to rely on would not include a general subjective assessment of defendant's character or involve any allegation that defendant had a propensity to commit rape. Instead, the evidence made the state's explanation of the facts (defendant's seminal fluid in Fraser's vaginal cavity and a high level of morphine in Fraser's body) more likely, and thereby made defendant's guilt both of rape in the first degree and sexual abuse in the first degree more likely.

We still must consider whether the evidence is sufficiently probative with respect to that theory. In past cases, this court has described the different factors that trial courts must consider when deciding whether to admit prior bad act or crime evidence for purposes of supporting a particular theory. Our cases suggest that, if evidence of prior crimes is to be admitted to prove identity based on *modus operandi*, the trial court must find a very high degree of similarity between the charged and uncharged crimes, as well as a methodology that is highly distinctive. *Pinnell*, 311 Or at 109-10. On the other hand, when prior crime evidence is to be admitted to prove intent, this court has indicated that a high degree of

---

[12] Count I of the indictment alleged that defendant intentionally caused Fraser's death "in the course of and in furtherance of" the crime of rape in the first degree; Count II made the same allegations respecting the crime of sexual abuse in the first degree; Count IV alleged that defendant killed Fraser to conceal the identity of the perpetrator of the crime of rape in the first degree; Count V made the same allegations respecting the perpetrator of the crime of sexual abuse in the first degree; Count VIII alleged that defendant killed Fraser to conceal the fact of the commission of the crime of rape in the first degree; and Count IX made the same allegation respecting the commission of the crime of sexual abuse in the first degree. Both rape in the first degree and sexual abuse in the first degree may be proved by showing the "[t]he victim [was] incapable of consent by reason of * * * mental incapacitation or physical helplessness." *See* ORS 163.375(1)(d) (rape in the first degree); ORS 163.427(1)(a)(C) (sexual abuse in the first degree).

similarity is helpful but is not essential, and that a distinctive methodology is entirely irrelevant. *See Johns*, 301 Or at 555-56 (so stating).

In our view, the analysis of the prior crime evidence in the present case falls somewhere in between *Pinnell* and *Johns*. There is no requirement that the evidence of the uncharged crime demonstrate a *distinctive* methodology or "signature" crime, as when such evidence is used to establish the identity of the perpetrator. However, it *is* essential that the uncharged crimes evidence involve a method of incapacitation (administration of an intoxicating substance) that would support the narrow inference that the state seeks to draw from it—that sexual contact between Fraser and defendant occurred while Fraser was incapacitated by morphine that defendant had administered.[13] And, although there is no requirement that the uncharged crime closely replicate the crime that is charged (as there is when prior crime evidence is used to establish identity), any similarity in the circumstances increases the probative value of the prior crime evidence and enhances the argument for admissibility under OEC 404(3). Likewise, the timing of uncharged crimes *vis-à-vis* the charged crime and the number of instances that are shown may affect the question of admissibility. No categorical rule exists, but timing, repetition, and similarity of both the act and the surrounding circumstances all are important considerations.

Applying the foregoing points to the first category of witnesses, we conclude that the trial court permissibly concluded that the witnesses' testimony was admissible for the noncharacter purpose of showing that Fraser did not consent and, in fact, was incapable of consenting to the sexual contact that she had with defendant. All but one of the witnesses testified that defendant had either offered them or slipped them a drug that caused them to pass out or become ill.[14] One of the

---

[13] Evidence that defendant had raped women or sexually abused women in the past would not be sufficient. Such evidence ultimately would rely on the idea that defendant had raped Fraser because he had a propensity to commit rape or sexual abuse.

[14] The remaining witness testified that she passed out after drinking alcohol that defendant had supplied and that, when she awoke, defendant told her that "we had fooled around" and that he had stuck his finger inside her. There was nothing

witnesses learned from a drug screen that the drug she had taken was an opiate—the same substance found in Fraser's system. She testified that defendant later had acknowledged that he had slipped some morphine into her drink and had told her that the morphine was left over from a supply that hospice staff had provided to his father, who had suffered from cancer. Another witness testified that defendant also had acknowledged giving her morphine that he had gotten from "his dad."

The testimony of most of the other witnesses strongly suggests that the drug involved was liquid morphine.[15] One witness indicated that defendant had poured a liquid from a brown bottle onto a rag and held it over her mouth until she passed out. Another witnesses also spoke of a liquid poured from a bottle onto a rag, but said that defendant had given her the rag to smell. Still another testified that she passed out after defendant gave her a capful of a liquid, which he told her was Ecstasy, to drink.

Four of the witnesses testified that defendant had sexually abused them in some fashion while they were passed out from the intoxicants that defendant had administered. One awoke to find defendant next to her and her underwear pulled down, two awoke to find defendant feeling their breasts, and another awoke to find defendant having intercourse with her. The testimony of those witnesses demonstrated that defendant had developed a method for obtaining sexual access to women without their consent (which method involved administration of incapacitating drugs, commonly liquid morphine) and permitted the jury to infer that the victim, like others, had not consented to the sexual contact with defendant that other evidence all but conclusively established had occurred.[16] It also permitted the jury to

---

in her testimony, other than the fact that she had passed out, that would suggest that she had been given morphine or any other drug.

[15] A hospice nurse who assisted defendant's family when defendant's father was dying of cancer in the fall of 1997 testified that the hospice team had provided the family with liquid morphine to help defendant's father with "breakthrough pain." She testified that the morphine was a colorless, odorless liquid with a bitter taste that usually comes in a brown bottle that protects it from light.

[16] The trial court also allowed two of the witnesses to describe a drugging incident that did not involve sexual abuse. Those two witnesses testified that, in December 1997, while attending a concert with defendant, they drank a beverage

draw another inference that was relevant to the state's theory—that defendant had administered the morphine that was found in Fraser's system.

That inference is strengthened by the multiplicity of similar incidents (suggesting a pattern), the fact that all the incidents occurred within the year preceding Fraser's murder, and the fact that the victims of those uncharged crimes all were teenage girls who moved in the same circles as Fraser. In short, the testimony in the first of defendant's guilt-phase categories is relevant to a significant noncharacter issue in the case and therefore passes muster under OEC 404(3).[17]

Defendant also appears to challenge the trial court's decision to admit the testimony of a young man, Franklin, to the effect that one of the young women who testified about being drugged and sexually assaulted by defendant had reported the incident to him at the time that it occurred. We conclude that, although the testimony referred to prior bad acts by defendant and contained hearsay, it served a purpose other than establishing defendant's bad character or the truth of the matter asserted. On cross-examination of the young woman in question, defense counsel brought out that

that defendant had offered to them that made them very ill and that they later learned had contained liquid morphine. Although neither of the women indicated that defendant had sexually abused them in any way during that incident, their description of the event suggests that that may have been only for lack of an opportunity. In any event, the testimony was consistent with the drugging aspects of the testimony of the other witnesses in the category and also was relevant to show that, shortly before Fraser's death, defendant possessed some quantity of liquid morphine.

[17] Although this case has certain superficial similarities to *State v. Pratt*, 309 Or 205, 785 P2d 350 (1990) (both are aggravated murder cases involving underlying sex crimes), the cases present wholly different issues under OEC 404(3). In *Pratt*, the state wished to present evidence that defendant had raped a different victim some years earlier and sought to avoid the prohibition on propensity evidence on the theory that the defendant's intentional rape of another woman made it more probable that he intended to commit the crime of attempted rape on the murder victim. We did not question that theory of relevance. However, we concluded that the evidence was not sufficiently probative of the defendant's intent, based on our application of the six-part test set out in *State v. Johns*, 301 Or 535, 548, 725 P2d 312 (1986), which test is specific to the issue of intent.

In the present case, the state also wished to put on evidence of defendant's past sex crimes. However, the state's primary theory of relevance (to prove Fraser's incapacity to consent) was very different from the state's theory in *Pratt*. *Pratt*, therefore, plays no part in our present analysis.

she willingly had taken some drugs from defendant, that her memory may have been impaired by drugs and alcohol, and that she had not reported the incident to the police. Franklin's testimony was admissible for the purpose of rehabilitating a witness whose truthfulness and accuracy of memory had been challenged in cross-examination. OEC 801(4)(a)(B).

Defendant also appears to be challenging the guilt-phase testimony of Robinson, a young woman who was acquainted with defendant. Robinson testified that, a week before Fraser died, defendant had come to her home, had shown her that Fraser was passed out in the back seat of his car, and had referred to Fraser as a "lesbian" and a "model." Robinson also testified that, on February 28, 1998, defendant had arrived at her home early in the morning, had gotten into her bed uninvited, and had asked her if he could stay at her apartment. Robinson reported that she had refused defendant's request and that she also had berated defendant for getting her 15-year-old sister drunk.

In the hearing on defendant's motions *in limine*, defendant argued that Robinson's testimony was inadmissible "prior bad act" evidence. However, and assuming that the first incident that Robinson described even qualifies as a "prior bad act," it is clear that it was relevant to other facts at issue in the case. Robinson's description of the incident suggested the nature of defendant's relationship with Fraser—that, even if defendant were attracted to Fraser, he knew that she was a lesbian and, therefore, less likely to be attracted to him.

Robinson's testimony about the second incident fits more easily into the "prior bad act" mold, in that it showed that defendant had provided alcohol to a minor. However, that aspect of Robinson's testimony was a relatively minor part of her overall story, which was relevant to show that, as of February 28, 1998, defendant was trying to avoid his own home (a possible indication of guilty knowledge). Moreover, defendant did not separately object to it, as he was required to do if he wished to have it excluded. We find no error.

Defendant also challenged the guilt-phase testimony of his probation officer, Crocker, on the ground that it

necessarily informed the jury of his criminal past. However, Crocker's testimony was relevant to the issue of defendant's residency in Washington County—an issue that defendant chose to contest and that was vital to an element (venue) of the state's case. Crocker's testimony was limited to that issue: Crocker reported what he knew about where defendant was residing in February 1998, when the murder occurred and avoided any mention of defendant's past crimes. Crocker's testimony was relevant to a noncharacter issue and its admission did not violate OEC 404(3).

Defendant also suggests that, even if relevant for some noncharacter purpose, all the foregoing testimony was unfairly prejudicial and, as such, was inadmissible under OEC 403. We disagree. Although the testimony clearly was prejudicial, it also was strongly probative with respect to issues that were vital to the state's case, *viz.*, whether Fraser consented to sexual contact with defendant, whether defendant had administered the opiates that were found in Fraser's system, whether defendant intended to take advantage of Fraser's incapacitated state, whether defendant had access to morphine, and whether defendant resided in Washington County at the time of the murder. None of the testimony is of such a character that OEC 403 necessarily would require its exclusion. We conclude that the trial court did not err in admitting the testimony.[18]

## V. HEARSAY—FRASER'S STATEMENTS OF INTENT

Defendant next argues that the trial court erred in allowing various witnesses to testify that Fraser had told them, on the evening of February 23, 1998, that she was going to Marty's to "play on the computer." Defendant sought to exclude testimony about Fraser's statements in the two motions *in limine* already described, but the issue further crystallized when the state filed what it styled a "Notice of OEC 804(3)(f) Evidence." In that filing, the state theorized that, although Fraser's statements were hearsay, they were

---

[18] Our ruling in this regard makes it unnecessary to consider what role is played by OEC 404(4), which provides:

"In criminal actions, evidence of other crimes, wrongs or acts by the defendant is admissible if relevant except as otherwise provided by [certain other rules of evidence and the state and federal constitution]."

admissible under OEC 803(3) as evidence of her state of mind and, particularly, of her intent to go to "Marty's" house later that night. Defendant argued that the statements were not admissible under the "state of mind" exception to the hearsay rule. The trial court rejected defendant's argument and ruled that the testimony was admissible, although it acknowledged that the evidence should be "heavily circumscribed" and indicated that the parties should work out the details.

Before this court, defendant argues that, even if Fraser's hearsay statements theoretically were admissible to show her state of mind at the time that she made them, they could not lawfully be admitted for that purpose because Fraser's state of mind was not relevant to any issue in the case. Defendant suggests that the state's real purpose in introducing the statements and their only real relevance was to show defendant's state of mind and, ultimately, his future conduct. Defendant contends that, according to the Legislative Commentary to OEC 803(3), the statements should have been excluded.

We disagree. The Legislative Commentary to OEC 803(3) shows that the legislature's intent, in adopting that rule, was to "render statements of intent by a declarant admissible only to prove the declarant's future conduct, not the future conduct of another person." Laird C. Kirkpatrick, *Oregon Evidence*, Art VIII-77 (4d ed 2002). That commentary does not mean that a hearsay statement of intent is automatically inadmissible because the jury might use it as a basis for inferring the intentions and future actions of some person in addition to the declarant. It merely means that such statements are inadmissible for such a purpose and that, to the extent that they can serve no other purpose in the context of the case, they may be inadmissible altogether.

In the present case, the trial court clearly recognized the foregoing distinction. It concluded that, even excluding any implication about *defendant*'s intentions that might arise from Fraser's statements, her intention to "go to Marty's" (and the implication that she carried through with that plan) was relevant to the issue of where she was when she was murdered—in other words, venue. Having concluded that the statements fell within the exception set out at OEC 803(3),

for that limited purpose, the trial court left it to the parties to work out how to keep the testimony within those confines or otherwise to limit its effect.

Defendant contends that, even if Fraser's statements were admissible for the limited purposes of establishing her state of mind and future conduct, allowing them to come in at all was unfairly prejudicial, in that jurors necessarily would draw inferences about defendant's state of mind and conduct. But defendant made no request for a limiting instruction warning the jury against drawing such inferences—a fact that we find to be dispositive. Had defendant made such a request, the trial court either would have allowed it (hence obviating any potential error) or would have denied it. Defendant is not entitled to profit from the fact that he never gave the trial court the opportunity to rule either way.

Defendant also contends that, regardless of its admissibility under the evidence rules, admission of hearsay reports that Fraser was planning to go to "Marty's" violated his constitutional rights under the Sixth Amendment and Article I, section 11, to confront all witnesses against him. Defendant largely relies on the United States Supreme Court's recent decision in *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004). *Crawford* overruled earlier federal case law holding that out-of-court statements of declarants who do not testify at trial may be admitted if the trial court finds "adequate indicia of reliability." *Crawford* held, instead, that out-of-court statements that are "testimonial" in nature are absolutely inadmissible, unless the defendant has had an opportunity to test the reliability of those statements through cross-examination. *Id.*, 541 US at 68.

*Crawford* did not definitively explain what kind of statements fall within the "testimonial category," but indicated that the category might include "material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." *Id.* at 51. Defendant asserts—as he must—that Fraser's statements to various parties that she was "going to Marty's" would fall into that category. The state

argues, on the other hand, that Fraser's statements were not "testimonial"; that, for confrontation clause purposes, "testimonial" statements are only those that are made under circumstances that would lead a witness to believe the statement was intended for use at a later trial, such as affidavits and statements made to the police.

Although we are unsure at this juncture of the precise scope of the term "testimonial" as the Supreme Court used it in *Crawford*, we agree with the state that the concept does not include "the statements made by an unsuspecting victim of a crime before that crime has even occurred." We note, in that regard, that the statements at issue are wholly unlike the ones that *Crawford* describes as testimonial, *viz.*, "affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." *Id.* We conclude, in short, that admission of Fraser's statements does not create the Sixth Amendment issue that defendant asserts.[19]

## VI. DEFENDANT'S REQUEST FOR APPOINTMENT OF NEW COUNSEL

■     Defendant next argues that the trial court erred in denying his various requests for appointment of new counsel. He cites to various "relevant" portions of the transcript, but is otherwise unspecific about what motions were made, which rulings were objectionable, and which facts support his claim. We assume that defendant's challenge is directed at two "rulings": (1) the trial court's May 4, 2001, refusal to accept defendant's *pro se* motion for substitute counsel and its comment, after hearing defendant's complaints, that, "[b]ased on what I've heard there, I wouldn't remove [counsel]"; and (2) the trial court's failure to act on an "affidavit" that defendant filed on July 23, 2001, asking the court to replace defendant's lawyers or "instruct them to follow [his] legitimate requests."[20]

---

[19] Although defendant alludes to Article I, section 11, of the Oregon Constitution, in his argument to this court, he makes no separate argument under that provision, and we decline to address it.

[20] Defendant alludes to other instances when the issue of substitute counsel arose, but none of those other instances appears to involve a reviewable decision by the trial court denying a request for substitute counsel.

In his argument to this court, defendant does not rely on or even advert to any particular inadequacies of trial counsel. Instead, he focuses on the broader proposition that the trial court erred by failing to make a sufficient inquiry into his complaints. He notes that, under *State v. Langley*, 314 Or 247, 257, 839 P2d 692 (1992), *adh'd to on recons*, 318 Or 28, 861 P2d 1012 (1993), a defendant's request for new counsel "requires a factual assessment of whether the complaint is 'legitimate.' " Defendant acknowledges that a trial court's denial of a request for substitute counsel is reviewed for abuse of discretion, *id.* at 258, but he contends that, in his case, the trial court erred by exercising its discretion without inquiring adequately into the legitimacy of his complaints.

This court recently considered a similar claim in *State v. Smith*, 339 Or 515, 123 P3d 261 (2005). There, the defendant indicated to the trial court, on the day of trial, that he was dissatisfied with his trial lawyer. The trial court listened to the defendant's complaints and ultimately concluded that trial counsel was adequate. Upon his conviction, the defendant appealed and argued, *inter alia*, that the trial court had erred by not holding a hearing or otherwise inquiring into the basis of the defendant's dissatisfaction with his lawyer. The Court of Appeals agreed with that argument, *State v. Smith*, 190 Or App 576, 90 P3d 145 (2003), and remanded the defendant's case for a hearing about defendant's complaints. On review, we held that, contrary to the Court of Appeals decision, there is no rule of law requiring a trial court to conduct an inquiry into, and make a factual assessment of, a defendant's complaints about appointed counsel. *Smith*, 339 Or at 530. We also held that a trial court's failure to inquire into the facts underpinning a complaint about counsel does not violate a defendant's constitutional right to assistance of counsel, because post-conviction procedures provide a constitutionally sufficient mechanism for obtaining relief when trial counsel has been inadequate. *Id.* at 530. Finally, we held that, where the defendant had expressed general concerns about "fair representation" and had suggested that defense counsel had not investigated his case sufficiently, the trial court had not abused its discretion in denying the motion on the ground that the defendant had not advanced any legitimate reasons for appointing substitute counsel. *Id.* at 531.

Our decision in *Smith* resolves much of defendant's assignment of error. Specifically, it disposes of his claim that the trial court erred in failing to hold an inquiry into defendant's complaints and to make a "factual assessment" based on that inquiry. That leaves us to consider whether, on the record that was before it, the trial court abused its discretion in denying defendant's requests for substitute counsel. Defendant's claim is directed at two specific decisions by the trial court denying such requests. We turn to those decisions.

On May 4, 2001, the trial court indicated that defendant must make any request for substitute counsel through his lawyers, but also allowed defendant at that time to describe his concerns orally. Defendant indicated that trial counsel had refused to file motions that defendant wished them to file, on the ground that such filings would be a waste of time. Defendant also indicated that he had asked his lawyers to research various issues and implied that they had declined to do so. The trial court suggested that the lawyers had been right about certain of defendant's requests being a waste of time. It also explained that most of defendant's complaints were about strategic decisions that were for the lawyers, and not defendant, to make. Ultimately, the court told defendant that the two lawyers were "the best that I can give you" and that he would not remove them based on what he had heard. In sum, the trial court considered defendant's complaints and—on this record, at least—reasonably concluded that those complaints did not present a legitimate reason for appointing new counsel. The trial court did not abuse its discretion in denying defendant's May 4, 2001, request for substitute counsel.

On July 23, 2001—in the midst of *voir dire*—defendant again asked the court to appoint new counsel "or instruct them to follow my legitimate requests." Trial counsel explained, at that time, that defendant was unhappy about counsel's "inability or refusal to carry out a wide variety of legal tasks that he has asked us to do that he feels are appropriate." The trial court reiterated its earlier position—that defendant was complaining about legal and strategic decisions that were not his to make. The trial court then invited defendant to compile and file a list of complaints, which it would consider and then seal for purposes of appeal. In response to that invitation, defendant presented the court

with a large folder on August 9, 2001, which purportedly contained a "list of items" relating to his complaints about trial counsel. Apparently, the trial court found nothing in the material that defendant presented to suggest a legitimate reason for granting defendant's request for new counsel. The court did not grant defendant's request.

We have reviewed the material that defendant presented to the trial court and find it to be more of the same—*i.e.*, complaints that trial counsel failed to file motions that defendant wished to file, failed to pursue issues and strategies that defendant wished to pursue, and generally failed to follow defendant's instructions. Neither the materials, nor defendant's similar oral complaints to the trial court, constitute a basis for concluding that the trial court abused its discretion in denying defendant's request for new counsel.

## VII.   DEFENDANT'S MOTION FOR ACCESS TO LAW LIBRARY, LEGAL MATERIALS, AND OTHER RESOURCES

Defendant argues, next, that the trial court erred in denying his "Motion for Defendant Access to Police Reports, Law Library, Research Materials and Grievance Procedures," filed on August 4, 2000. The motion asked the trial court to issue an order requiring the Washington County Sheriff's Department to, among other things, allow defendant access to the law library eight hours per day, allow defendant to keep pleadings, research, and other materials relating to his case in his cell without interference by jail personnel, and allow defendant access to a computer and to the Internet. Defendant attached to the motion an affidavit by one of his trial lawyers averring that Washington County Jail personnel had repeatedly searched and confiscated defendant's trial materials, had never allowed defendant to keep more than a quarter inch of legal paperwork in his cell, and had severely restricted defendant's use of the law library.

Defendant did not ask for a hearing on the motion at the time that it was filed. However, defense counsel subpoenaed several employees of the Washington County Jail to appear in court on October 24, 2000, apparently with the intent of arguing defendant's motion for access at that time.

The court previously had reserved that date for an omnibus hearing on defendant's various suppression motions.

At the October 24, 2000, proceeding, defense counsel began to set out the factual background relating to defendant's "access" motion. The prosecutor indicated that he objected to proceeding any further with the matter because (1) defense counsel had failed to follow the trial court's previous direction that the motion be set for a separate hearing; (2) the district attorney's office was not responsible for and was not prepared to litigate issues relating to defendant's treatment in jail; and (3) defense counsel had failed to serve a copy of the motion on the jail's proper representative, the County Counsel for Washington County. The trial court then questioned County Counsel (who had moved to quash defendant's subpoenas and had come to the proceeding to argue that motion) about when and how he had learned about defendant's motion and why he had failed to respond to it. Eventually, the trial court threw up its figurative hands, declaring that "confusion is rampant." The trial court granted the motion to quash defendant's subpoenas and told defense counsel to schedule a separate hearing on the motion in front of another judge. Defendant's lawyers apparently did not follow through on that instruction, *i.e.*, they did not schedule a hearing on the motion in front of the designated judge. Consequently, the trial court never actually ruled on the motion that defendant has identified.[21]

It should be clear from the foregoing summary that the essential factual premise for defendant's claim of error—that the trial court denied his motion for access—is absent. It follows that the trial court did not and could not have erred in the way that defendant has suggested.

## VIII. CHALLENGES TO THE INDICTMENT

At trial, defendant filed a "Demurrer and Alternate Motion to Bar Capital Trial," arguing that the indictment was defective in that it failed to allege two elements of the

---

[21] Defendant asserts that the access issue "came up" in later proceedings—specifically, in the course of discussions of defendant's motion for appointment of substitute counsel on May 4, 2001, and in similar discussions on July 23, 2001. It is clear, however, that the trial court never would have understood defendant's complaints about his lawyers to be, instead, a complaint about lack of access.

crime of "capital aggravated murder." Defendant asserted that "capital aggravated murder" constitutes a different crime from "simple aggravated murder," the distinction being that the former crime involves additional "elements" not relevant to the latter crime, *viz.*, that (1) defendant acted deliberately; and (2) with the reasonable expectation that the death of the deceased would result. Defendant then argued that, because, in the present case, the state had failed to allege those two statutory "sentencing factors" in the indictment, defendant never was charged with "capital aggravated murder" and neither the judge nor the jury could convict him of or sentence him for that crime. The trial court rejected that argument and denied the motion.

We see no error in the trial court's decision. This court has rejected the idea that the crime defined in ORS 163.095—aggravated murder—somehow imports additional elements from ORS 163.150, the death-penalty sentencing provision. *See, e.g., State v. Wagner*, 305 Or 115, 171-72, 752 P2d 1136 (1988), *vac'd and rem'd on other grounds*, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989) (*Wagner I*). Although defendant suggests that *Wagner I* conflicts with more recent federal and Oregon cases pertaining to the constitutional right to jury trial, we see no conflict. The cases that defendant cites suggest or hold that a jury must decide the "deliberateness" and "reasonable expectation of death" questions set out in ORS 163.150(1)(b)(A) because, depending on how they are answered, they may increase the punishment for the underlying offense. However, nothing in those cases suggests that those questions necessarily define a separate crime of capital aggravated murder and, as such, that they must be set out in the indictment. *See State v. Sawatzky*, 339 Or 689, 698, 125 P3d 722 (2005) (no authority exists for defendant's claim of a federal constitutional right to have aggravating or enhancing factors alleged in indictment).

Defendant also mounts various "global" challenges to the constitutionality of Oregon's death-penalty scheme in three separate assignments of error. The various constitutional issues that defendant raises in those three assignments of error all have been examined and rejected by this court in previous cases. Defendant acknowledges as much, but he argues that those cases were wrongly decided and that

the constitutional issues should be decided anew.[22] However, nothing that defendant has offered persuades us that those earlier decisions were wrong. We conclude that the trial court did not err in denying defendant's motions and rejecting his demurrer.

## IX. *VOIR DIRE* ISSUES

### A. *Defendant's Motion to Subpoena Jury Pool Materials*

On March 20, 2001, defendant filed a motion asking the trial court to issue subpoenas *duces tecum* to the Washington County Trial Court Administrator and the State Court Administrator, directing those officers to produce a lengthy list of documents and records—virtually everything produced, utilized, or collected by the state and Washington County that pertained to jury selection. A supporting memorandum set out the reasons for the subpoena, *i.e.*, to obtain information needed to determine whether the jury panel for defendant's case met the fair cross-section requirement of ORS 10.215(1) and the impartial jury requirements of the Sixth Amendment to the United States Constitution and Article I, section 11, of the Oregon Constitution. The trial court denied the motion, but suggested to defendant that it might change its mind if presented with some preliminary factual showing that the method of selecting the jury pool is or was constitutionally suspect.

Defendant challenges that denial. We have considered defendant's arguments and concluded that they are either not well taken or are unpreserved. None merits discussion here.

### B. *Excusal of Potential Jurors for Cause*

Defendant contends that the trial court erred in granting the state's request to excuse, for cause, ten potential jurors who indicated that they could not, under any circumstances, vote to impose the death penalty. A more complete discussion of this assignment of error would not benefit the public, bench, or bar. It is not well taken.

---

[22] Defendant also raises the issues to preserve potential challenges to Oregon's death-penalty scheme in federal court.

C. *Denial of Motions to Excuse Pro-Death Penalty Jurors for Cause*

In the next six assignments of error, defendant argues that the trial court erred in refusing to excuse six different potential jurors for cause on the ground that they were firm supporters of the death penalty. Again, we have concluded that none of these assignments is well taken, and that a more complete discussion of them is not warranted.

## X. DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

At the close of the state's case, defendant moved for a judgment of acquittal on various counts charged in the indictment. He argued that the state had failed to present sufficient evidence to support a jury finding that (1) defendant had kidnapped Fraser (a fact underpinning three of the aggravated murder counts); (2) defendant had raped Fraser (a fact underpinning three more of the aggravated murder counts); and (3) the murder occurred in Washington County or, in the alternative, defendant resided in Washington County at the time of the murder (facts necessary to establish venue for all of the aggravated murder counts). The trial court granted defendant's motion with respect to the three kidnapping-based aggravated murder counts, but otherwise denied the motion. Ultimately, defendant was convicted of the remaining aggravated murder counts.

Before this court, defendant argues that the trial court erred in denying his motion with respect to those remaining aggravated murder counts because (1) there was insufficient evidence to support a jury finding that defendant had raped Fraser; (2) there was insufficient evidence to support a jury finding that the murder occurred in Washington County or that defendant's residence was in Washington County at the time of the murder. We already have explained how the state's evidence would permit the jury to conclude that defendant drugged Fraser and had sexual contact with her while she was unconscious, acts which would constitute rape in the first degree. We shall not repeat that discussion here. Defendant's arguments on this point are not well taken. The arguments in the second category also are not well taken and do not merit discussion. We find no error.

## XI.   OTHER ISSUES

Defendant raises several other assignments of error, some through the brief filed by counsel and others raised by defendant *pro se*. We have considered each assignment and find none either to be well taken or to merit discussion.

The judgments of conviction and the sentence of death are affirmed.