**Filed:  July 19, 2012**

IN THE SUPREME COURT OF THE STATE OF OREGON


STATE OF OREGON,

Respondent on Review,

v.

RONALD MARCUS LEISTIKO,

Petitioner on Review.

(CC C072939CR; CA A141169; SC S059191)

En Banc

On review from the Court of Appeals.*

Argued and submitted November 8, 2011.

Meredith Allen, Senior Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for petitioner on review.  With her on the brief was Peter Gartlan, Chief Defender.

Shannon T. Reel, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review.  With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

The decision of the Court of Appeals is reversed in part and affirmed in part.  The judgment of the circuit court is reversed in part and affirmed in part, and the case is remanded to the circuit court for further proceedings.


*Appeal from Washington County Circuit Court, Steven L. Price, Judge. 240 Or App 338, 246 P3d 82 (2011).

KISTLER, J.

The state charged defendant with, among other things, three counts of first-degree rape. Each count involved a different victim and arose out of a separate incident. To prove that each of the three victims had not consented to defendant's sexual advances, the state offered evidence that defendant had forcibly compelled a fourth woman to engage in sexual intercourse with him.[1] The trial court ruled that the fourth woman's testimony was admissible, and the jury convicted defendant of two of the three counts of first-degree rape.[2] On appeal, the Court of Appeals upheld the admission of the fourth woman's testimony, relying in large part on this court's decision in *State v. Johnson*, 340 Or 319, 131 P3d 173 (2006). *State v. Leistiko*, 240 Or App 338, 343-45, 246 P3d 82 (2011). We allowed defendant's petition for review and now reverse the Court of Appeals decision in part. We also reverse the trial court's judgment in part and remand for further proceedings.

Each of the three victims testified at trial. The first victim told the jury that she is an adult entertainer who advertises on the "erotic services" page of Craigslist, a website on which people post classified ads. Defendant called in response to her ad, and she came to his house to dance for him while he masturbated. While she was dancing,

---

[1] The alleged rape of the fourth woman occurred in another county, and the state did not charge defendant with that crime in this case.

[2] In addition to the two convictions for first-degree rape, the jury convicted defendant of 11 other counts, including strangulation, second-degree kidnapping, prostitution, fourth-degree assault, and furnishing alcohol to a minor. Defendant also pleaded guilty to stalking and harassment. All told, the trial court's judgment included convictions for 15 offenses.

defendant repeatedly attempted to grab her, and she stepped back, telling defendant, "[I]f you keep doing that, I will leave. Don't do anything until I tell you to." After a while, she began taking steps to leave. When she did so, defendant "stood up and tackled [her] as if he was a football player and [she] hit the ground." She testified that "he pu[t] his hands around my neck and [was] choking me to the point where I'm almost blacking out." Later he put a pillow over her face, making it difficult for her to breathe. She explained that, "between the pillow and the choking, [I'm] realizing there's no way, there is no way I'm getting out of this * * * and so I told him that if he used a condom, I would quit screaming." Defendant complied with her request and had sexual intercourse with her.

The second victim testified that she worked as a prostitute and that her pimp advertised her services on the erotic services page of Craigslist. She met defendant three times. The first time, she was 15 years old. She came to defendant's home with another woman in response to defendant's telephone call asking for a "two girl special." That time, both women had sexual relations with defendant. Later, defendant called and asked for the second victim again. When she went to his house, they discussed whether he would wear a condom. He did, they had intercourse, but he did not complete the act. He took off the condom, and they lay there for a few minutes. Then, he began touching her and started to "force himself on top of [her]." She testified that she told him to put a condom on first, but "he said no and he grabbed my arms and held them with one hand above my head and he forced my legs apart with his knees and raped me."[3] After that,

---

[3] Because the second victim was under 18, she lacked the legal capacity to consent to sexual intercourse with defendant. *See* ORS 163.315(1)(a) (a person under 18

the second victim saw defendant one more time. He tricked her into getting into his car at a restaurant and drove her some distance against her will. She managed to escape, however, before any sexual activity occurred.

The third victim testified that she was 18 and had just graduated from high school when she met defendant. She had placed a personal ad on the "women seeking men" page of Craigslist. According to the third victim, people who advertise on that page of Craigslist are looking for a friend or a relationship. Defendant called the third victim in response to her ad, and they exchanged telephone calls and emails. In their emails, he sent her pictures of his genitalia and she reciprocated. She also discussed her dildo with him, and he asked her to come to his house and bring it with her, which she did one evening.

When the third victim arrived at defendant's house, he fixed her a drink. Several times, he tried to kiss her as they walked around the house, but she turned her head away. She lay down on his bed and took a nap for a few minutes, and then they got into the hot tub. She was clothed; he was not. Although she initially did not want to sit near him, he began touching her and encouraging her to touch him. After they got out of the hot tub, they gave each other back massages. At one point, he stopped massaging her

_____
years of age lacks the capacity to consent to sexual acts). The state, however, did not charge defendant with third-degree rape for the first encounter on the ground that the second victim was too young to consent. *See* ORS 163.355 (defining third-degree rape as sexual intercourse with a person under 16 years of age). Rather, it charged him with first-degree rape for the second encounter on the ground that he forcibly compelled the second victim to engage in sexual intercourse. There was no evidence that defendant employed force the first time he had sexual relations with the second victim or, at least initially, the second time.

3

back, got on top of her, and did not respond when she told him to "stop." In an attempt to "calm [him] down a little bit," she suggested that he use the dildo on her, which he did. After a few minutes, he grew tired of that activity and held her down with both of his hands and had sexual intercourse with her. He put enough pressure on her chest to make her short of breath. She kept telling him to stop, and he "kept saying, 'Don't fight it. We're just trying to have fun.'" Afterwards, he cooked a hamburger for her and did some work on her car.

After those witnesses testified, the state made an offer of proof. It called a fourth woman, who testified outside the presence of the jury. She explained that she works as a masseuse; however, because she is not licensed, she does not advertise her services on the therapeutic services page of Craigslist. Rather, she advertises on the erotic services page. Each advertisement states that she is "not a full service girl" -- a disclaimer that is intended to put customers on notice that she does not provide sexual services for money. If a client asks for sexual contact during the massage, she tells them, in a quiet, firm voice, "That's not what I do."

Defendant answered her advertisement and came to her house. Initially, "he was a perfect gentleman." Later, however, he started asking "if [she] did other things for money." She explained, more than once, that she did not. The third time he asked, he began to get aggressive. At that point, she said, "if you have a problem with this, I'm going to ask you to leave." He grasped her by the shoulders, sat her down on the bed and began massaging her back and shoulders. Then he pushed her face down on the bed, told her this was going to be fun, that she'd "never had a grown man like him and [that] he

4

would give [her] what [she] needed." After fighting for 30 seconds, she gave up. At some point, they moved from the bed to the floor. She testified that she was on the floor with her face in the carpet. He put pressure on "[her] lower back, right above [her] hip bones with [his] forearm" and had sexual intercourse with her.

After considering the state's offer of proof, the trial court ruled that the fourth woman's testimony was admissible to prove that the three victims had not consented to defendant's advances. The fourth woman then testified to essentially the same facts set out above. Defendant, for his part, did not dispute that he had had sexual intercourse with the three victims. He testified, however, that the women had not resisted his advances but instead had consented to engage in sexual intercourse with him. Put differently, defendant did not concede that he had forcibly compelled any of the three victims to engage in sexual relations with him. After hearing the evidence, the jury convicted defendant of raping the first two victims but acquitted him of raping the third.

On appeal, defendant challenged the trial court's ruling admitting the fourth woman's testimony.[4] In upholding that ruling, the Court of Appeals noted that this court had stated in *Johnson* that "evidence of a defendant's uncharged misconduct can be probative regarding the issue of whether an alleged victim consented to sexual contact with the defendant." *Leistiko*, 240 Or App at 343. Following *Johnson*, the Court of Appeals concluded that the evidence in this case permitted the jury to find that defendant

---

[4]    Defendant also argued that the trial court had erred in denying a motion to suppress and in failing to require jury unanimity. The Court of Appeals rejected those arguments without discussion. Defendant does not pursue those arguments on review.

had established a plan for obtaining sexual access to women without their consent and that that evidence was relevant to rebut defendant's claim that the three victims had consented to his sexual advances. *Id.* at 345. We allowed defendant's petition for review to consider whether the fourth woman's testimony was admissible.

Before turning to that issue, we address two preliminary issues. The first is procedural. ORS 132.560(1)(b)(A) provides that two or more offenses may be charged in one indictment as separate counts if the same person or persons allegedly committed each offense and the offenses are "[o]f the same or similar character." A trial court, however, may sever those counts and "order an election or separate trials of [the joined] counts" if trying the counts together would substantially prejudice either the state or the defendant. ORS 132.560(3); *see generally State v. Miller*, 327 Or 622, 626-33, 969 P2d 1006 (1998) (discussing when joining similar offenses will prejudice a defendant). When a trial court declines to sever joined offenses, and evidence relating to one offense is not admissible to prove another joined offense, a trial court ordinarily will instruct the jury to consider the evidence on each offense separately to prevent the jury from using the evidence offered to prove one offense to decide another joined offense. *See Miller*, 327 Or at 632 (recognizing the risk that a jury may use evidence admitted to prove one count in deciding whether the state has proved a joined count).

In this case, the indictment joined three separate counts of first-degree rape. *See* ORS 132.560(1)(b)(A) (permitting the joinder of those counts for trial). At trial, the state did not argue that evidence relating to one count was admissible to prove another count; the state did not argue, for example, that evidence that defendant had forcibly

6

compelled the first victim to engage in sexual intercourse was admissible to prove that he forcibly compelled the second victim to engage in that conduct. Rather, the only "other crimes" evidence that the state sought to admit was the fourth woman's testimony, which it sought to admit to prove each of the three separate counts of first-degree rape. As the state acknowledges on review, to the extent that that inquiry turns on the similarity of the uncharged misconduct to the charged misconduct, the admissibility of the fourth woman's testimony may vary from one count to the next.

The second preliminary issue involves the relationship between the elements of first-degree rape and consent. ORS 163.375 defines the crime of first-degree rape. It provides:

> "(1) A person who has sexual intercourse with another person commits the crime of rape in the first degree if:
>
> "(a) The victim is subjected to forcible compulsion by the person.
>
> "(b) The victim is under 12 years of age;
>
> "(c) The victim is under 16 years of age and is the person's sibling, of the whole or half blood, the person's child or the person's spouse's child; or
>
> "(d) The victim is incapable of consent by reason of mental defect, mental incapacitation or physical helplessness."

Paragraphs (b), (c), and (d) require proof that the victim lacked the capacity to consent, either as a result of the victim's age or as a result of the victim's mental or physical condition. *See* ORS 163.315 (explaining, among other things, that a person under 18 years of age lacks the legal capacity to consent to certain sexual acts).

Paragraph (a), the paragraph that applies in this case, does not refer

expressly to consent. Rather, in contrast to paragraphs (b), (c), and (d), paragraph (a) requires proof that the defendant forcibly compelled the victim to engage in sexual intercourse. *See* ORS 163.305(2) (defining forcible compulsion);[5] *State v. Marshall*, 350 Or 208, 218-19, 253 P3d 1017 (2011) (explaining that the first-degree sexual abuse statute requires a causal connection between "forcible compulsion" and sexual contact). Implicit in the requirement that a defendant caused the victim to engage in sexual intercourse by means of forcible compulsion is the proposition that the sexual act did not occur as a result of the victim's consent. Put differently, a defendant charged with violating ORS 163.375(1)(a) may always raise consent as a defense, either in the sense that the sexual act occurred as a result of consent rather than as a result of forcible compulsion or in the sense that, to the extent that force was involved, the victim consented to it.

With that background in mind, we return to the state's argument that the fourth woman's testimony was admissible. We note, as an initial matter, that the state's argument starts from the proposition that the fourth woman's testimony was admissible only if it complied with OEC 404(3). That rule provides:

---

[5]      ORS 163.305(2) provides:

"'Forcible compulsion' means to compel by:

"(a) Physical force; or

"(b) A threat, express or implied, that places a person in fear of immediate or future death or physical injury to self or another person, or in fear that the person or another person will immediately or in the future be kidnapped."

8

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

*See State v. Garrett*, 350 Or 1, 6-11, 248 P3d 965 (2011) (applying OEC 404(3)). Under OEC 404(3), evidence that defendant forcibly compelled the fourth woman to have sexual intercourse with him is not admissible to prove that he forcibly compelled any of the three victims to have sexual intercourse with him; that is, the rule prohibits the state from introducing the fourth's woman's testimony to prove that defendant has a propensity to forcibly compel women to engage in sexual intercourse and that he acted in conformity with that propensity with the three victims. *See State v. Johns*, 301 Or 535, 548, 725 P2d 312 (1986) (explaining that OEC 404(3) prohibits the admission of other crimes evidence if it is offered to prove "(1) the character of a person, and (2) that the person acted in conformity therewith").[6]

OEC 404(3) does not prohibit the state from offering the fourth woman's testimony if it is relevant for some other legitimate purpose, however. *See State v. Cox*, 337 Or 477, 484-85, 98 P3d 1103 (2004) (explaining that OEC 404(3) did not prevent the defendant from introducing evidence of the victim's past violent acts to prove that the defendant feared the victim). In this case, the state argues that the fourth woman's testimony was admissible to prove: (1) each victim's state of mind; (2) defendant's state of mind; or (3) a plan that defendant carried out with each of the three victims. We

---

[6] The state does not argue that propensity evidence is relevant and thus admissible under OEC 404(4). We express no opinion on that issue.

consider each of those arguments in turn.

There is a suggestion in the state's brief that the fourth woman's decision not to engage in sexual relations with defendant was relevant to prove that each of the three victims made the same decision. The fact, however, that one woman consented (or refused to consent) to have sexual relations with defendant does not mean that another woman made the same choice. *See Lovely v. United States*, 169 F2d 386, 390 (4th Cir 1948) ("The fact that one woman was raped * * * has no tendency to prove that another woman did not consent."). In that context, there are too many independent variables for one victim's state of mind to be relevant to prove another's.

To be sure, this court held in *Johnson* that the other crimes evidence in that case "permitted the jury to infer that the victim, like others, had not consented to the sexual contact with [the] defendant * * *." *Johnson*, 340 Or at 341; *see Leistiko*, 240 Or App at 343 (relying on that passage from *Johnson*). But that statement cannot be divorced from the context in which it was made. The other crimes evidence in *Johnson* showed that, over a period of time, the defendant repeatedly had drugged young women and sexually molested them while they were incapacitated. *See* 340 Or at 340-41 (describing the other crimes evidence). This court held that the jury could infer from that evidence that the defendant had a plan or method for obtaining sexual access to women while they were incapacitated and acted pursuant to that plan with the victim in that case. *Id.* at 341-42. We discuss *Johnson*'s use of other crimes evidence to prove a plan or method more fully in analyzing the state's third argument. It is sufficient to note here that *Johnson* does not stand for the proposition that, if the victims have the mental capacity to

10

consent, one victim's decision not to consent to a defendant's sexual advances is relevant to prove that another victim made the same choice.

The state advances a second argument. It contends that the fourth woman's testimony was relevant to prove defendant's state of mind. Specifically, it argues that the fourth woman's testimony was relevant to prove that "defendant intended to forcibly compel the victims to have sexual intercourse with him." (Boldface type omitted.) Applying the multi-factor test set out in *Johns*, *see* 301 Or at 555-56, the state argues on review that the similarity between the uncharged offense and each of the charged offenses was sufficient for the fourth woman's testimony to be relevant to prove defendant's intent with regard to at least one of the charged offenses. Before explaining why we reach a different conclusion, we think it is helpful to review this court's decision in *Johns*.

This court held in *Johns* that other crimes evidence was admissible in that case to disprove the defendant's claim that he accidentally shot his wife in the head. *Id.* at 559. The defendant in *Johns* did not dispute that he had shot his wife but claimed that, when he entered their darkened bedroom, she shot at him. *Id.* at 537-38. According to the defendant, he lunged for the gun and, in his attempt to take the gun away from his wife, he accidentally caused the gun to discharge and kill her. *Id.* To disprove the defendant's claim that the shooting was accidental, the state introduced undisputed evidence that the defendant had attempted to shoot his former wife approximately six years earlier. *See id.* at 540-41 (describing other crime evidence).

This court held that the other crimes evidence was relevant to prove that

11

defendant had not acted accidentally and that its relevance did not derive from an inference about defendant's character. Rather, the court reasoned that, under the doctrine of chances, "'the more often [a] defendant performs the actus reus, the smaller is the likelihood that the defendant acted with an innocent state of mind.'" *Id.* at 552 (quoting Edward Imwinkelreid, *Uncharged Misconduct Evidence* § 5:05, 10-11 (1984)). The court explained that the doctrine of chances does not "as[k] the trier of fact to infer the defendant's conduct (entertaining a particular *mens rea*) from the defendant's subjective character." *John*, 301 Or at 554. It depends instead on the proposition that multiple instances of similar conduct are unlikely to occur accidentally. *Id.*

In deciding whether the earlier attempt on the defendant's former wife was admissible under the doctrine of chances, this court observed that some commentators had reasoned that "more than one prior similar instance of conduct" was required before evidence would be relevant to disprove an accidental occurrence. *Id.* This court declined, however, to draw an arbitrary line. It explained:

> "Depending upon the circumstances of the case, sometimes one prior similar act will be sufficiently relevant for admissibility and sometimes not. A simple, unremarkable single instance of prior conduct probably will not qualify, but a complex act requiring several steps, particularly premeditated, may well qualify."

*Id.* at 555.

Applying that principle, this court noted that the trial court in *Johns* had found five "mental state similarities" and six physical similarities between the prior

attempt and the completed shooting.[7] Given those findings, this court reasoned that the similarities between the two events were sufficient to invoke the doctrine of chances; that is, in light of the complex nature of the two acts and the premeditation required for some aspects of both acts, the court concluded that one prior act was sufficient in that case to invoke the doctrine of chances and uphold the admission of the other crimes evidence to prove that the shooting was not accidental. *See id.* at 559.

A second aspect of *Johns* is worth noting. The defendant in *Johns* did not dispute that both acts had occurred. *See id.* at 537-38. Only the defendant's mental state in committing those acts was at issue. *See id.* That aspect of *Johns* reflects what Wigmore has described as a "peculiar feature" of the doctrine of chances. *See* John Henry Wigmore, 2 *Evidence* § 302, 245 (Chadbourne rev 1979).[8] Wigmore explained:

> "It will be seen that the peculiar feature of this process of proof [the doctrine of chances] is that the *act itself is assumed to be done*, -- either because (as usually) it is conceded, or because the jury are instructed not to consider the evidence from this point of view until they find the act to have been done and are proceeding to determine the intent."

*Id.* (emphasis in original). Wigmore reasoned that, when the question is not whether a

---

[7] The mental state similarities were marital discord, the defendant's failure to become a police officer, his financial dependence on his spouse, threatened physical abuse, and threats to kill his wife if she either left him or were with another man. 301 Or at 556-57. The physical similarities were "[i]n the morning, armed with a previously loaded weapon, no drinking involved, entered spouse's premises, attempted to kill [or killed] spouse, called police, and threatened suicide." *Id.* at 557.

[8] In explaining that the doctrine of chances permits the introduction of other crimes evidence for a nonpropensity purpose, *Johns* took the doctrine from Wigmore, who first articulated it, and Imwinkelreid, who explained Wigmore's reasoning. *See Johns*, 301 Or at 552-54 (quoting Wigmore and Imwinkelreid). It follows that the limitation on the doctrine of chances that Wigmore articulated bears on the analysis that *Johns* adopted.

13

defendant committed the act but is instead only whether the defendant acted with an innocent state of mind, the proponent of uncharged misconduct evidence need only show that the uncharged and charged conduct were similar.[9]  *Id.* § 302 at 245.  Conversely, "[w]hen the very doing of the act charged is still to be proved," Wigmore reasoned that a party can introduce evidence of a defendant's plan to do the act to prove that the defendant acted pursuant to the plan.  *Id.* § 304 at 249-52.  However, something more than prior similar acts is required to establish a plan.  *Id.*

Not only is *Johns* consistent with the limitation on the doctrine of chances that Wigmore articulated, but so is this court's decision in *State v. Gailey*, 301 Or 563, 725 P2d 328 (1986), which was a companion case to *Johns*.  In *Gailey*, this court held that, where the defendant had not admitted that he was in the victim's house, evidence that he possessed property stolen from another house was not admissible to prove that he intended to burglarize the victim's home.  *Id.* at 568.  That is, where the occurrence of the act remained at issue, this court held that evidence of the prior crime was not admissible to prove intent.  *Id.*[10]

---

[9]    Wigmore used the word "intent" broadly.  *See* Wigmore, 2 *Evidence* § 301 at 238.  He explained that "intent more frequently signifies * * * merely the absence of accident, inadvertence, or casualty -- a varying state of mind which is the contrary of an innocent state of mind."  *Id.*  Accordingly, when Wigmore, and *Johns* in reliance on Wigmore, refers to the absence of mistake or accident as the equivalent of intent, it does not appear that either is using intent only in the limited sense that the Oregon criminal statutes use that term.  *Cf.* ORS 161.085(7) (defining intentionally or with intent).

[10]    This court reasoned in *Gailey*:

"The defendant did not contend that he was in [the victim's] home by accident or mistake with no intent to steal.  Once again, no logical inference can be drawn that because defendant possessed stolen goods from another

14

With that background in mind, we turn to the question that this case poses: whether the fourth woman's testimony was admissible to prove defendant's intent. On that issue, the state argues that the fourth woman's testimony was relevant to prove, at a minimum, that defendant acted intentionally when he forcibly compelled the third victim (the high school graduate) to engage in sexual intercourse with him. The state reasons that the fourth woman and the third victim were in the same class of victims in that neither "offer[ed] sex or sexual display for money," that both the charged and uncharged misconduct required proof of intent, that the acts (forcibly compelled intercourse) were the same, and that the physical elements of the prior and present act were similar.[11]

The state's argument is problematic for two reasons. First, as explained

_____

burglary, he therefore intended to burglarize [the victim's] home. At best all that can be inferred is that persons who possess stolen property intend to steal and that if defendant had entered the [victim's] home he would have had the intent to steal. But this reasoning has a fatal gap because no evidence directly or circumstantially places this defendant in the [the victim's] home."

301 Or at 568. Although no evidence placed the defendant *in* the victim's home, as the court noted, the victim testified that the defendant's car had been parked in her driveway when she entered her home and discovered that it had been burglarized. *Id.* at 565. There was also evidence that the defendant's car had been parked near the home of the person whose stolen property was later found in his car. *Id.* at 566.

[11] The state acknowledges that the fourth woman's testimony might not be similar enough to prove defendant's intent regarding the first and second victims. Specifically, it notes that the first and second victims may be "in a distinctly separate class" from the fourth woman because they offered "sex or sexual display for money" while the fourth woman did not. The state reasons, however, that "as long as the [fourth woman's testimony] was admissible as to the counts relating to [the third victim], the trial court did not err by admitting [the fourth woman's testimony]" to prove defendant's intent regarding that victim and that, without a request for a limiting instruction, defendant cannot complain if the jury considered the fourth woman's testimony in determining defendant's intent regarding the first and second victims.

15

above, the doctrine of chances rests on the proposition that the defendant either concedes the act that requires proof of a mental state or the trial court instructs the jury not to consider uncharged misconduct evidence offered to prove intent unless and until the jury finds the act that requires proof of intent to have been done and is proceeding to determine intent. *See* Wigmore, 2 *Evidence* § 302 at 245. Neither of those conditions occurred here. Defendant never conceded that he forcibly compelled any of the three women to engage in intercourse with him, and the trial court neither admitted the uncharged misconduct evidence as conditionally relevant nor instructed the jurors to consider that evidence on the issue of intent only if they first found that defendant had forcibly compelled the women to engage in intercourse with him. To admit the fourth woman's testimony in the absence of one of those conditions poses, as the court recognized in *Gailey*, an unacceptable risk that the uncharged misconduct evidence is being admitted to prove the act, not the defendant's mental state.

The state's argument suffers from a second problem. As noted above, in this case, the state argues that a single instance of uncharged misconduct is relevant to prove defendant's intent to forcibly compel the third woman to engage in sexual intercourse with him. Although this court recognized in *Johns* that "sometimes one prior similar act will be sufficiently relevant for admissibility," it cautioned that whether one prior similar act will suffice "[d]epend[s] upon the circumstances[.]" 301 Or at 555. As the court explained, "[a] simple, unremarkable single instance of prior conduct probably will not qualify, but a complex act requiring several steps, particularly premeditated, may well qualify." *Id.*

16

It is difficult to categorize the fourth woman's testimony as anything other than an "unremarkable single instance of prior conduct." The fourth woman's testimony revealed that defendant contacted women who advertise on Craigslist with the hope of consensual sexual activity. Only when the fourth woman resisted his advances did he resort to force to compel her to engage in sexual intercourse with him. The fact that defendant resorted to force when a woman resisted his advances is not a complex factual scenario. As such, the fact that defendant resorted to force on one other occasion (with the fourth woman) does not make that act sufficiently relevant to prove that he acted intentionally regarding the third woman. *Cf. id.* at 555 (articulating that standard for similarity). Put differently, the prior act in this case is not the sort of single "complex act requiring several steps, particularly premeditated," that will suffice to establish intent under the doctrine of chances.[12]

The state advances a final reason why the fourth woman's testimony was admissible. It contends that her testimony was relevant to show that "defendant had 'developed a method for obtaining sexual access to women without their consent.'" (Quoting *Johnson*, 340 Or at 341.) As we understand the state's argument, it rests on two premises. First, a plan to do an act is relevant to prove that the defendant in fact acted pursuant to that plan. Second, it is possible to infer a plan from prior similar

---

[12] We note that the state did not argue at trial that defendant's charged conduct regarding any of the victims was admissible to prove its case against any other victim, nor does the state make that argument on review. Indeed, it makes the contrary argument. Accordingly, the state is left with the argument that one instance of aggression when rejected is sufficient to prove defendant's intent.

17

conduct. Those premises find some support in this court's decision in *Johnson*. In that case, the police found a young woman's body on a beach. *Johnson*, 340 Or at 321. The physical evidence showed that she had been strangled, that she had a significant amount of morphine in her system when she died, and that, based on the DNA evidence, she recently had had sexual relations with the defendant. 340 Or at 321-22. To show that the defendant in *Johnson* had had sexual relations with the victim while she was incapacitated, the state offered, and the trial court admitted, evidence that the defendant repeatedly had drugged other young women (usually with morphine) and, while they were incapacitated, had sexually abused them. *Id.* at 340-41.

This court upheld the admission of that evidence in *Johnson*, reasoning that it was relevant to show that the defendant "had developed a method for obtaining sexual access to women without their consent," *i.e.*, while they were incapacitated by drugs, and that he acted pursuant to that plan with the victim in *Johnson*. *Id.* at 341. This court did not identify why the evidence in *Johnson* was relevant for some reason other than to prove propensity. However, its reasoning is consistent with Wigmore's explanation that other crimes evidence may be admissible to prove a plan or design on which the defendant acted. *See* Wigmore, 2 *Evidence* § 304 at 249-52 (explaining that theory of admissibility).

Wigmore distinguished the use of other crimes evidence to prove intent, as opposed to plan, as follows:

"In the former case (of intent) the attempt is merely to negative the innocent state of mind at the time of the act charged; in the present case the effort is to establish a definite prior design or system which included the doing of

18

the act charged as part of its consumption. In the former case, the result is to give a complexion to a conceded act, and ends with that; in the present case, the result is to show (by probability) a precedent design which in its turn is to evidence (by probability) the doing of the act designed."

*Id.* § 304 at 249. Wigmore reasons explicitly, as *Johnson* did implicitly, that a pattern of prior similar acts may be admissible to prove a plan or design. Wigmore, 2 *Evidence* § 304 at 249; *Johnson*, 340 Or at 340-41. However, as both Wigmore and *Johnson* recognized, the level of similarity required to prove a plan or design is greater than the level of similarity required to prove intent. *See* Wigmore, 2 *Evidence* § 304 at 249, *Johnson*, 340 Or at 340-41. As Wigmore explained, in order to infer a plan or design from prior similar acts, the proponent of the evidence must show "not merely a similarity in the results, but *such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations*." Wigmore, 2 *Evidence* § 304 at 249 (emphasis in original); *cf. Johnson*, 340 Or at 340 (explaining that the prior bad acts evidence in that case established a greater connection than that required to prove intent but less than that required to establish *modus operandi*).

We recognize that inferring a plan or design from prior similar acts to prove that a defendant acted consistently with that plan is vulnerable to the claim that the prior bad acts are merely propensity evidence. *See* Edward J. Imwinkelreid, 1 *Uncharged Misconduct Evidence* § 3:24, 3-163 - 3-167 (2009) (so stating).[13] As a result of that

---

[13] Imwinkelreid distinguishes between "true plan" evidence, in which the state offers evidence, for example, that a defendant stole a gun to commit a robbery, *see* Imwinkelreid, *Uncharged Misconduct Evidence* § 3:22 at 3-147, from "spurious plan"

19

concern, Imwinkelreid would impose a stricter requirement on prior similar acts offered to establish a plan or design than Wigmore would; in his view, those acts should be admissible to prove a plan or design only if they are sufficient to establish a *modus operandi*. *Compare id.* (stating that proposition), *with* Wigmore, 2 *Evidence* § 304 at 249, § 357 at 334-35 (requiring a lesser degree of similarity than Imwinkelreid would).

In this case, we need not decide whether Imwinkelreid or Wigmore has the better of the argument. Wigmore, Imwinkelreid, and *Johnson* all make clear that something more than the similarity required for other crimes evidence to be admissible to prove intent is necessary for it to be admissible to prove a plan. As explained above, however, the fourth woman's testimony was not sufficiently similar for it to be admissible to prove intent. It necessarily follows that her testimony also was not sufficiently similar for it to be admissible to prove a plan that would permit the jury to infer that defendant acted consistently with that plan -- namely, that he forcibly compelled each of the victims to engage in sexual intercourse with him. None of the grounds that the state has advanced justified admission of the fourth woman's testimony. The trial court erred in admitting it.

Defendant argues that, if the trial court erred in admitting the fourth woman's testimony, the error prejudiced him. The state does not argue that the error was harmless, and we agree that the admission of the fourth woman's testimony prejudiced

---

evidence in which the state relies on a series of prior similar acts to establish a plan or design to commit those acts, *see id.* § 3:24 at 3-161. In his view, prior similar acts may be admitted to establish a plan or design only if those acts are sufficiently unique to establish a *modus operandi*. *Id.* § 3:24 at 3-166.

20

defendant. The remaining question is the effect of the error. On appeal and again on review, defendant has argued that the erroneous admission of the fourth woman's testimony requires that his "convictions" be reversed, but he has not specified which convictions, other than his two first-degree rape convictions, may have been affected by the error. Given the absence of any argument by defendant that the erroneous admission of the fourth woman's testimony affected any conviction other than his first-degree rape convictions, we reverse the Court of Appeals decision to the extent that it affirmed the two first-degree rape convictions. *Cf.* OEC 103(1) (evidential error is not presumed prejudicial). Similarly, we reverse the trial court's judgment to the extent that it included two convictions for first-degree rape, and we remand the case to the trial court for further proceedings.

The decision of the Court of Appeals is reversed in part and affirmed in part. The judgment of the circuit court is reversed in part and affirmed in part, and the case is remanded to the circuit court for further proceedings.