Submitted September 13, 2011, reversed and remanded December 5, 2012

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ROGER ROBERT FEBUARY,
*Defendant-Appellant.*

Lincoln County Circuit Court
080982; A141519

292 P3d 604

E. Thomas Dunn, Jr., filed the brief for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Inge D. Wells, Senior Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Brewer, Judge, and Sercombe, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

Following a jury trial, defendant was convicted of two counts of first-degree sexual abuse, ORS 163.427 (Counts 1 and 4); one count of furnishing alcohol to a minor, ORS 471.410(2) (Count 2); one count of attempted sodomy in the second degree, ORS 163.395; ORS 161.405(2)(c) (Count 3); and one count of harassment, ORS 166.065(4) (Count 7). On appeal, he raises four assignments of error, the first of which is that the trial court erred in refusing to exclude evidence of prior bad acts involving the alleged victim's two sisters, S and A, because the evidence was insufficient to establish a "plan" under OEC 404(3).[1] His other assignments of error relate to the admission of other testimony, the denial of a motion for continuance, and the imposition of a 170-month prison sentence. We conclude that the trial court should have excluded the evidence involving S, though not the evidence involving A, because unlike the latter, the former evidence was insufficient to establish a "plan" under OEC 404(3). Because we reverse and remand on that basis, we need not reach defendant's other assignments of error.

Before trial, defendant filed a pretrial motion *in limine* to exclude evidence of defendant's alleged prior acts of sexual abuse of S and A. At the hearing on defendant's motion, the state offered the testimony of each sister to show that defendant had a plan to sexually abuse the alleged victim, S. M.

S, the oldest of the three sisters, testified as follows. Defendant was in a relationship with the sisters' mother and moved in with the family when S was 12 years old. S lived with them off and on until she was 20. Although defendant "took care of [them] financially," S and defendant never got along, and she did not see him as a father figure. S believed that her mother "always took [defendant's] side" and that, if S had a problem with defendant, she could not discuss her concerns with her mother. When S was younger,

---

[1] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

defendant told her details about "[losing] his virginity." On another occasion, defendant told S that, "when [she] was skinny, [she] looked hot," and that "[her] breasts and [her] butt were huge."

One day, when S was 20 years old, defendant "asked if [she] wanted to get drunk," and S said that she did. At the time, her mother and her sister, A, were out of town attending a wedding. Defendant poured a "tall glass of tequila," and S started drinking it. As they were drinking, defendant "kept on filling it before it was empty," and S became drunk. Although S later "[did not] remember a lot of what happened," she remembered defendant "sucking on" her breasts. She also remembered that, at one point, she was in "a little room outside our back porch that had a hot tub in it" and either "[defendant] laid [her] down or *** [she] was already laid down," and defendant was "licking [her] vagina." S told defendant, "[n]o," because "[i]t felt wrong." That entire week, defendant came into her bedroom at night and "ask[ed] for sex." On another occasion, S was lying on the couch in the living room when defendant "put his hand on [her] leg," and she "kicked him off of [her]." Defendant told S that she "moaned in [her] sleep" and that that meant she "moan[ed] during sex." S did not tell her mother about these events at the time they happened, because she did not think her mother would believe her.

A testified as follows. She was five years old when defendant moved in with the family. She viewed defendant "like [her] stepfather" and believed that they were "[v]ery close." A's relationship with her mother was "okay," but she believed that her mother "was always *** closer to" defendant and that defendant "was favored over her kids."

A and defendant frequently "wrestle[d] around" and "played fighting." One day when A was about 13, she stayed home from school because she was sick. Defendant was home as well, but her mother was at work. A was sitting on the couch when defendant "starting wrestling around" with her. A's sweat pants started to fall down, so she told defendant, "'I need to go *** put on *** a pair of jeans or something so that my pants aren't falling down if we're going to *** keep fighting.'" A then went around the kitchen island, not

realizing that defendant was following behind her. A testified, "He got behind me and shoved me up against the counter with his crotch on my butt so hard I had bruises on my hips." Defendant was "[p]umping" against her, and A "didn't feel comfortable" and "wanted to get away." She "was scared" and "was alone in the house with" defendant. Eventually she "broke free" and "went running into [her] bedroom." Defendant followed her into her bedroom and "pushed [her] on the bed." She was "face-down" and defendant then "got on top of [her] back" and "started nibbling on the small of [her] back and the top of [her] butt." A told defendant to "get off" and that "he was hurting" her, and she either "kicked him off of [her]" or "he got scared and left."

A few days after the incident, while A was alone with defendant in his car, defendant told A that "he would pay [her] $300.00 to do what [they] had done a few nights before but a little bit more." Initially, A did not tell her mother what had happened with defendant, because "everything [defendant] said goes," and A "didn't think [her mother] was going to believe [her]." Shortly thereafter, A ran away from home. After her mother kept asking her to come home, A told her what had happened with defendant. Her mother cried and "got rid of" defendant, but about two weeks later defendant moved back in. A did not report the incidents to authorities, and she did not return home because she "could never live with [defendant]." She did not see her mother for "three or four years."

The alleged victim, S. M., testified as follows. She had lived with defendant since she was two years old and, until the incidents of sexual misconduct, she viewed their relationship as being "like a dad and a daughter." When she was 13, defendant "start[ed] wrestling" with her. On one occasion, S. M. was in the computer room at home, when defendant pulled her down from the chair and "started sucking and biting on [her] neck." Defendant held her down, and S. M. "asked him to stop." S. M. started crying because "it hurt so bad." Around that time, defendant also asked S. M. for "a blow job" on three or four separate occasions and, on one occasion, asked her to have sex. On another occasion, defendant was balancing on an exercise ball when S. M.

kicked the ball and caused him to fall. Defendant pinned S. M. down and "started pulling" on her pants and "ripped" them.

About a month later, S. M. was home in bed because she was feeling ill. Defendant was home at the time, and S. M.'s mother was at work. Defendant asked S. M. "if [she] was feeling alright," and S. M. responded that she "had a really bad headache." Defendant gave her a glass of vodka and told her that it "would help with [her] headache." S. M. drank the vodka and fell asleep. When she woke up, S. M. told defendant that her headache "didn't go away." Defendant then "brought another glass of vodka" to her, and she went "to sleep after the second one." When she woke up, defendant gave her a glass of wine and she drank less than "half of it." She fell asleep again and, when she woke up, defendant came back into her bedroom "to talk to [her], and he touched [her] in inappropriate areas," first "put[ting] his hands down" and touching her "under" her underwear in her "vaginal area" and second touching her "over" her underwear.

The following day, S. M. was lying in bed when defendant "put his head in-between [her] legs." S. M. said that she "closed [her] legs" and "pushed him off the bed." She believed that defendant was trying to engage in oral sex with her. Defendant told her not to tell her mom and, indeed, she did not do so because, "after it happened with two of [her sisters, she] knew that [her mother] wouldn't believe [her]."

Defendant subsequently was charged with (among other things not at issue here) two counts of first-degree sexual abuse, ORS 163.427 (Counts 1 and 4); one count of furnishing alcohol to a minor, ORS 471.410(2) (Count 2); one count of attempted sodomy in the second degree, ORS 163.395; ORS 161.405(2)(c) (Count 3); and one count of harassment, ORS 166.065(4) (Count 7). Counts 1 through 4 concern the alleged incidents that took place when S. M. was ill: Counts 1 and 4 alleged that defendant had sexual contact with S. M. by touching her vagina over and under her clothing; Count 2 alleged that defendant furnished alcohol to S. M., a minor at the time of the incident; and Count 3 alleged that defendant engaged in deviate sexual

intercourse with S. M. Count 7 concerned the alleged incident in which defendant engaged in offensive physical contact by kissing and sucking on S. M.'s neck.

In defendant's closing arguments on the motion *in limine*, he contended that the testimony of S and A was inadmissible character evidence. Defendant argued that the evidence was "precluded by OEC 403" because "its prejudicial value * * * significantly outweighs the probative value." Defendant also argued that all three girls had "three different sets of complaints," and, thus, the evidence was "simply an effort to impeach [defendant] by insinuations and by claims that he has some kind of sexual propensity for young girls of different ages under different circumstances * * *."

The state responded that the testimony of S and A was relevant for a noncharacter purpose—to show that defendant had a plan to sexually abuse S. M. In its memorandum, the state opined that the testimony of S and A evidenced a common theme in which all three sisters viewed defendant as a father figure and that defendant "took advantage of his position and the children's vulnerability." The state also argued that, "[e]qually important" is "the knowledge * * * defendant had about how the family would react to his 'plan'"; all three sisters believed that their mother would "believe [defendant] and not them."

In its memorandum, the state discussed the testimony of S and A as they each applied to support evidence of a plan in S. M.'s case. With regard to S's testimony, the state argued that defendant "got [S. M.] drunk, just like he did [S], so at best their memory would be able to be challenged[,] at worst he could lower their ability to resist him. The request to perform oral sex, and the solicitation for sexual intercourse all are so similar as to show 'plan'." With regard to A's testimony, the state argued that it evidenced defendant's plan to "take advantage of his position and that he had been grooming [A and S. M.] for sexual contact." The state identified the similarities between A and S. M.:

"Both girls were teenagers at the time of the contact. Prior sexual contact began while defendant physically wrestled with both [A] and [S. M.]. They were both children dependant for care and were in a position where they

thought of * * * defendant as a father figure. Each girl had [her] pants ripped off while 'wrestling' with * * * defendant, conduct that * * * defendant initiated. Sexual contact was attempted while both girls were home sick. [A] was held down on her bed while * * * defendant bit her buttocks and legs, and [S. M.] was held down in the office while * * * defendant gave her a hickey on her neck. While the body parts of contact were different, the physical act of being held down against their will while * * * defendant put his mouth on them is consistent with the plan to use the [ruse] * * * defendant was perpetrating.

"In both situations, * * * defendant plays this behavior off as 'horsing around' and believes he can play it off as a game. The behavior was highly sexualized, and both girls realized it. He was teaching [A] how to 'fight' and with [S. M.] was just 'wrestling around' or 'horsing around' physically, setting up the perfect situation to touch the girls in a sexual manner. Both girls believe this all began as innocent play but left feeling very sexually victimized. * * *"

The trial court denied defendant's motion *in limine*, ruling that the evidence was admissible "for the reasons set forth in the [s]tate's [m]emorandum."

At trial, before the state elicited testimony from both S and A, defendant renewed his objection that the testimony was "inadmissible propensity evidence" and that the court was required to "engage in a balancing test under *State v. Johns*[, 301 Or 535, 725 P2d 312 (1986),] even though * * * 403 [*sic*] seems to say balancing isn't appropriate." The trial court declined to change its ruling on defendant's pretrial motion that the testimony of S and A were admissible as evidence of a plan under OEC 404(3). The court then provided the jury with a limiting instruction to consider the testimony only for that purpose, and S and A testified about the sexual misconduct consistently with their testimony at the pretrial hearing.

On appeal, defendant renews his challenge to the trial court's refusal to exclude the testimony of S and A, arguing that the prior sexual misconduct described by S and A was not sufficiently similar to the charged conduct to be admissible "plan" evidence under OEC 404(3) and that,

in determining the admissibility of that evidence, the court erred in not engaging in OEC 403 balancing.

We begin with the text of OEC 404(3), which provides:

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

That evidentiary rule, the Supreme Court explained in *Johns*, is a rule of inclusion and, as such, permits the introduction of "other crimes, wrongs, or acts" evidence as long as the evidence is relevant to a noncharacter purpose. 301 Or at 548. "Some degree of similarity or connection between the prior acts and the charged conduct is necessary to establish the logical relevance of the evidence, no matter the rationale for its admission." *State v. Kaylor*, 252 Or App 688, 701-02, 289 P3d 290 (2012). As the court in *State v. Leistiko*, 352 Or 172, 282 P3d 857, *adh'd to as modified on recons*, 352 Or 622, 292 P3d 522 (2012), recently explained, when used for the noncharacter purpose of proving a "plan," the requisite degree of similarity between the prior acts and the charged crime is particularly high. "[S]omething more is required than mere repeated conduct to establish that a defendant acted pursuant to a plan." *State v. Pitt*, 352 Or 566, 579 n 7, 293 P3d 1002 (2012) (citing *Leistiko*, 352 Or at 184). The *Leistiko* court, by reference to John Henry Wigmore, 2 *Evidence* § 304 (Chadbourne rev 1979), distinguished between the use of prior bad acts evidence for proving intent, as opposed to plan to illustrate that point:

> "Wigmore distinguished the use of other crimes evidence to prove intent, as opposed to plan, as follows:
>
>> "'In the former case (of intent) the attempt is merely to negative the innocent state of mind at the time of the act charged; in the present case the effort is to establish a definite prior design or system which included the doing of the act charged as part of its consummation. In the former case, the result is to give a complexion to a conceded act, and ends with that; in the present

case, the result is to show (by probability) a precedent design which in its turn is to evidence (by probability) the doing of the act designed.'

"*Id.* § 304 at 249. Wigmore reasons explicitly, as [*State v. Johnson*, 340 Or 319, 340-42, 131 P3d 173 (2006)], did implicitly, that a pattern of prior similar acts may be admissible to prove a plan or design. Wigmore, 2 *Evidence* § 304 at 249; ***. However, as both Wigmore and *Johnson* recognized, the level of similarity required to prove a plan or design is greater than the level of similarity required to prove intent. *See* Wigmore, 2 *Evidence* § 304 at 249, *Johnson*, 340 Or at 340-41. As Wigmore explained, in order to infer a plan or design from prior similar acts, the proponent of the evidence must show 'not merely a similarity in the results, but *such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.*' Wigmore, 2 *Evidence* § 304 at 249 (emphasis in original); *cf. Johnson*, 340 Or at 340 (explaining that the prior bad acts evidence in that case established a greater connection than that required to prove intent but less than that required to establish *modus operandi*)."

*Leistiko*, 352 Or at 187-88.

As indicated above, the pertinent question is whether there is "such a concurrence of common features" between the prior bad acts evidence concerning both sisters, and the charged conduct concerning S. M., such that "'the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.'" *State v. Bunting*, 189 Or App 337, 344, 76 P3d 137 (2003) (quoting *State v. White*, 53 Or App 856, 861, 632 P2d 1363 (1981)). Applying that standard to the facts of this case, we conclude that the prior bad acts evidence involving A is sufficiently similar to the charged conduct to be admitted as evidence for the purpose of showing defendant's "plan," but that the prior bad acts evidence involving S is not sufficiently similar and should not have been admitted.

We first address the connections between the evidence relating to A and the charged conduct involving S. M. Both sisters viewed defendant as a father figure from early childhood. Defendant attempted sexual contact

with each child when she was home alone with him and her mother was at work. Defendant engaged in grooming behavior with each child, which began as wrestling and horseplay but turned into inappropriate sexual touching. Some physical aspects vary—in A's case, defendant "started nibbling on the small of [her] back and the top of [her] butt," and, in S. M.'s case, defendant "started sucking and biting on [her] neck." However, in each case defendant physically held down the child against her will and put his mouth on her in a sexual manner. Behavior that began as nonsexual touching became very sexualized and left both children feeling victimized. Because a concurrence of common features links the evidence of defendant's conduct toward both children, the testimony of A was properly admitted as evidence of defendant's plan to commit the charged acts.

The evidence of uncharged misconduct involving S and the charged conduct likewise shares some similarities. Defendant offered alcohol to both S and S. M. and both girls were intoxicated when defendant initiated sexual contact with them; defendant engaged in oral sex with S and put his head between S. M.'s legs as though he was attempting to engage in oral sex with her; he propositioned both girls for sex; and the family relationships led both girls to believe that their mother would not believe them if they reported defendant's conduct. However, despite those similarities, there are significant differences between the two situations. S was a teenager when defendant first moved in with her family and she never viewed him as a father figure, nor did she engage in any playful physical contact with him before the sexual misconduct occurred. With regard to the incident involving alcohol, S was 20 years old when she accepted defendant's offer to "get drunk." By contrast, S. M. was a toddler when defendant first moved in, and she viewed him as a stepfather, had a close relationship with him, and engaged in horseplay with him which defendant escalated into sexual behavior. Defendant offered S. M. alcohol to "make her headache go away" while she was home sick from school. Despite some similarities, a "concurrence of common features" is not apparent between the uncharged misconduct involving S and the charged conduct involving S. M. and, thus, the trial erred in not excluding the testimony of S.

We further conclude that the error was not harmless. Given the nature of the conduct described and that it involved another member of the family, we cannot say that there is "little likelihood that the error affected the verdict." *State v. Phillips*, 314 Or 460, 471, 840 P2d 666 (1992).

Finally, we briefly address defendant's contention that, in determining the admissibility of the testimony of S and A, the trial court erred when it failed to engage in OEC 403 balancing. In criminal cases, OEC 404(4) precludes a trial court from excluding relevant evidence of a defendant's other crimes, wrongs, or acts under OEC 403, except as required by the state or federal constitutions. *See State v. Phillips*, 217 Or App 93, 98, 174 P3d 1032 (2007) ("[I]n criminal cases, that rule precludes OEC 403 balancing of probative value against, among other things, danger of undue prejudice."). Accordingly, the trial court here was not required to engage in OEC 403 balancing.

Reversed and remanded.